## FAIRMONT CREAMERY COMPANY *v.* MINNESOTA.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 725. Argued February 23, 1927.—Decided April 11, 1927.

1. A state law (G. S. Minn., § 3907) punishing anyone engaged in the business of buying milk, cream, or butter fat for manufacture or sale, who discriminates between different localities of the State by buying such commodities in one locality at a higher price than he pays for the same commodity in another locality, allowance being made for any difference in actual cost of transportation from locality of purchase to that of manufacture or sale—infringes the liberty of contract guaranteed by the Fourteenth Amendment. P. 8.
2. Such a sweeping inhibition can not be sustained as a means of preventing some buyers from attempts to destroy competition or secure a monopoly in the business by paying excessive prices. P. 9.
3. It is the duty of the Court to inquire into the real effect of any statute duly challenged because of interference with freedom of contract, and to declare it invalid when it has no substantial relation to any evil which the State has power to suppress but is a clear infringement of private rights. P. 11.

168 Minn. 381, reversed.

ERROR to a judgment of the Supreme Court of Minnesota sustaining a conviction of the Creamery Company of "unfair discrimination" in purchasing butter fat for

1

manufacture and sale. See also, 162 Minn. 146, and 168 Minn. 378.

*Mr. Leonard A. Flansburg,* with whom *Messrs. E. J. Hainer, George A. Lee,* and *M. S. Hartman* were on the brief, for plaintiff in error.

*Mr. Charles E. Phillips,* Assistant Attorney General of Minnesota, with whom *Mr. Clifford L. Hilton,* Attorney General, was on the brief, for defendant in error.

The federal Constitution does not guarantee to the individual absolute freedom of contract. *Miller* v. *Wilson,* 236 U. S. 373; *Schmidinger* v. *Chicago,* 226 U. S. 578; *Chicago Co.* v. *McGuire,* 219 U. S. 549; *Williams* v. *Evans,* 139 Minn. 32. Statutes making it an offense to discriminate in prices between different localities, when " intent " or " purpose " to create a monopoly or to destroy competition is made an ingredient thereof, have been uniformly sustained. *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157; *State* v. *Drayton,* 82 Neb. 254; *State v. Bridgeman, etc. Co.,* 117 Minn. 186; *State* v. *Standard Oil Co.,* 111 Minn. 85; *State* v. *Fairmont Creamery,* 153 Ia. 702; *State* v. *Rocky Mountain Elev. Co.,* 52 Mont. 487. Such a statute was enacted in Minnesota in 1909 (c. 468, Ls. 1909), and remained in force until the enactment of c. 120, Ls. 1923, here involved. Its validity was sustained in *State* v. *Bridgeman, etc., Co., supra.* In sustaining it the court found existing evils justifying this exercise of police power. In 1923 the legislature amended the law by striking therefrom the ingredient of intent or motive, thus making it an offense to discriminate in prices between localities, except as affected by the cost of transportation, whether done for the purpose of creating a monopoly or destroying competition or not (chapter 120). It was designed to meet and correct the same evils as the old statute. It must be assumed that in the judg-

ment of the legislature the remedy prescribed by the old law was ineffectual to accomplish the desired results.  The State, having found the old law ineffective to prevent the evil because of the almost impossibility of proving by competent evidence that price discrimination between localities was for the purpose of creating a monopoly, determined in its legislative judgment to prohibit discrimination between localities without regard to intent or motive.  A particular transaction, though lawful in and of itself, and although there inheres in it no purpose of creating a monopoly or destroying a competitor, may be prohibited if it be reasonably necessary so to do to suppress a substantial evil within the police power of a State to correct.  *Booth* v. *Illinois,* 184 U. S. 425; *Otis* v. *Parker,* 187 U. S. 606; *Purity Extract Co.* v. *Lynch,* 226 U. S. 192; *Geer* v. *Connecticut,* 161 U. S. 519; *New York* v. *Hesterberg,* 211 U. S. 31; *State* v. *Shattuck,* 96 Minn. 45; *Merrick* v. *Halsey Co.,* 242 U. S. 568; *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342; *Frisbie* v. *United States,* 157 U. S. 160.

Mr. JUSTICE MCREYNOLDS delivered the opinion of the Court.

The Supreme Court of Minnesota sustained the conviction of plaintiff in error, a corporation of that State charged with violating § 1, Chapter 305, Laws 1921, as amended by Chapter 120, Laws 1923 (Minn. G. S. § 3907), which follows—

"Any person, firm, co-partnership or corporation engaged in the business of buying milk, cream or butterfat for manufacture or for sale of such milk, cream or butterfat, who shall discriminate between different sections, localities, communities or cities of this State, by purchasing such commodity at a higher price or rate in one locality than is paid for the same commodity by said person,

firm, co-partnership or corporation in another locality, after making due allowance for the difference, if any, in the actual cost of transportation from the locality of purchase to the locality of manufacture or locality of sale of such milk, cream or butterfat, shall be deemed guilty of unfair discrimination, and, upon conviction thereof, shall be punished by a fine not exceeding one hundred dollars, or by imprisonment in the county jail for not exceeding 90 days."

Chapter 468, Laws 1909, prohibited discrimination in prices between localities "with the intention of creating a monopoly or destroying the business of a competitor." The Act of 1921 forbade such discrimination with "the purpose of creating a monopoly, or to restrain trade, or to prevent or limit competition, or to destroy the business of a competitor." The Act of 1923, *supra*, eliminated purpose as an element of the offense.

The cause was begun in Cottonwood County by a complaint which alleged—

That the Fairmont Creamery Company on June 11, 1923, at the Village of Bingham Lake, Cottonwood County, committed the crime of unfair discrimination in the purchase of butter fat for manufacture and sale, in the manner following: Said company, while engaged in the business of buying milk, cream and butter fat for manufacture and sale and while maintaining regularly-established stations for purchases at Madelia, Mountain Lake, Bingham Lake and other villages for shipment to Sioux City, Iowa, there to be manufactured and sold, did wrongfully, unlawfully and unfairly discriminate between said localities by paying a higher price for butter fat at some stations than at others, after due allowance for transportation costs. And, more particularly, on June 11, 1923, the company purchased cream at Madelia for thirty-eight cents per pound, and on the same day purchased cream of like quality at Mountain Lake and Bingham

Lake for thirty-five cents per pound, all being intended for transportation to Sioux City, Iowa, there to be manufactured and sold.   On that day the cost of transportation from Madelia to Sioux City was higher than from the other places.

Bingham Lake, Mountain Lake (in Cottonwood County) and Madelia (in Watonwan) are villages of Southern Minnesota, about 120, 130, and 160 miles, respectively, northeast of Sioux City, and are connected therewith by a single direct railroad line.

At the trial the accused company offered testimony to show: " That during the last nine years, the price paid for butter fat in the southern half of Minnesota, at the different towns, has varied in each town; that the variation has been from one cent to eight cents; that such price is exclusive of transportation charges; that such variation is the normal condition of the market in the sale of cream and butter fat, and is the result entirely of competitive conditions; that in certain localities there are many more competitors than there are in others; that the quality of cream differs in different localities; that the equipment and efficiency of creameries in the various localities differ, and that each of these things enters into the price that is paid for the butter fat in the particular locality where the sale is made, and that this variation in price, in each town, in the southern half of Minnesota, existed on the eleventh day of June, 1923, and that such variation is constant, and has existed for nine years previous to that time, and that these variations in price are due entirely to the economic conditions in each locality, and to competition."

The trial court excluded this evidence as immaterial, and the Supreme Court approved.   We may, therefore, treat the facts stated as though established and held to have no bearing on the question of guilt or the validity of the enactment.

Defense was made on several grounds—That the venue was improperly laid in Cottonwood County; that the statute conflicted with the federal Constitution by denying equal protection of the laws and liberty to contract; and that it unduly interfered with interstate commerce.

The cause has been before the Supreme Court of Minnesota three times. 162 Minn. 146; 168 Minn. 378 (Aug. 27, 1926); 168 Minn. 381 (Oct. 27, 1926). Two opinions discuss the merits of the controversy; the last affirmed conviction upon the earlier ones.

Replying to the objection that venue was improperly laid in Cottonwood County, locality of the lower price, the Supreme Court said: " The gist of the offense is the discrimination between different localities by paying different prices in different localities after making due allowance for the cost of transportation from the point of purchase to the point of sale or manufacture. The statute chooses to define the offense by referring to a higher price at one point than at another. It might define it by referring to the payment of a lower price at one point than another. The meaning would be the same. . . . The offending fact is that there are sales at different prices and thereby discrimination."

It next held that the statute did not deny equal protection to those engaged in buying cream for manufacture or sale since they properly might be treated as a distinct class and subjected to peculiar regulations.

Concerning the claim that the statute undertakes to deprive plaintiff in error of property and liberty of contract without due process of law, contrary to the Fourteenth Amendment, the court said—

" There have developed in the State a large number of so-called centralized creameries which buy in different localities. We take it that the defendant is one. In addition there are coöperative creameries and independent creameries not usually maintaining other buying stations,

though some may.  There is in the law nothing to prevent them doing so.   We do not understand that the buying stations are commonly localized plants.   [Counsel for the State say that creamery statistics for 1923 show then operating in the State six hundred and twenty-eight coöperative creameries, one hundred and twenty-seven independent or individual ones, and forty-eight 'centralizers.'] Often the buyer represents the creamery as an adjunct of his other business.   Often his compensation is through a commission.   He may have a place to receive the product or it may be delivered directly to the railroad station.   A centralized creamery, supplied with ample capital and facilities, has the ability and meets the temptation to destroy competition at a buying station by overbidding, absorbing the resultant losses, if any, through the profits of its general business and, when competition is ended, to buy on a noncompetitive basis.   If it does all this successfully, it has a monopoly, and may or may not treat producers justly.   The statute seeks to prevent the destruction of competition by forbidding overbidding unless the dealer makes prices at other buying points correspond after proper allowances for the cost of transportation. If the statute is obeyed destroying competition is expensive.   The statute limits the right of the creamery to contract at its buying points on a basis satisfactory to itself and its patrons.   The State must concede this, and it does.

   " The dairy industry, measured in money, is a large, perhaps just now the largest, productive industry of the State. . . . It is not surprising that in the marketing of so great a product, coming from so wide an area of production, under conditions such as obtain, those engaged in the industry claim abuses for which they seek legislative remedy.   The exercise of the police power is not confined to measures having in view health or morals of the community.   The welfare of a great industry and the people engaged in it may be guarded."

To the contention that the statute unduly burdens interstate commerce, the court replied: "A statute may indirectly or incidentally affect interstate commerce, as local police measures frequently do, without offending the commerce clause. . . . The defendant is a Minnesota corporation. The product which it purchased might have gone as well to a point in Minnesota for manufacture or resale. It so happened that it went to Iowa. The statute is not unconstitutional as an interference with interstate commerce."

Counsel for the State concede that the statute requires buyers to pay the same price for like commodities at all points of purchase, after proper allowances for transportation. Also, that it inhibits plaintiff in error from meeting local competition by increasing the price only at that place; also, from varying purchase prices to meet normal trade conditions.

They further admit that the State may not arbitrarily interfere with the right of one conducting a lawful business to contract at will; but they say that the federal Constitution does not guarantee absolute freedom of contract and the State may prohibit transactions not in themselves objectionable when within reason this may seem necessary in order to suppress substantial evil.

It seems plain enough that the real evil supposed to threaten the cream business was payment of excessive prices by powerful buyers for the purpose of destroying competition. To prevent this the statute undertook to require every buyer to adhere to a uniform price fixed by a single transaction.

As the inhibition of the statute applies irrespective of motive, we have an obvious attempt to destroy plaintiff in error's liberty to enter into normal contracts long regarded not only as essential to the freedom of trade and commerce but also as beneficial to the public. Buyers in competitive markets must accommodate their bids to

prices offered by others, and the payment of different prices at different places is the ordinary consequent. Enforcement of the statute would amount to fixing the price at which plaintiff in error may buy, since one purchase would establish this for all points without regard to ordinary trade conditions.

The real question comes to this—May the State, in order to prevent some strong buyers of cream from doing things which may tend to monopoly, inhibit plaintiff in error from carrying on its business in the usual way heretofore regarded as both moral and beneficial to the public and not shown now to be accompanied by evil results as ordinary incidents? Former decisions here require a negative answer. We think the inhibition of the statute has no reasonable relation to the anticipated evil—high bidding by some with purpose to monopolize or destroy competition. Looking through form to substance, it clearly and unmistakably infringes private rights whose exercise does not ordinarily produce evil consequences, but the reverse.

In *Adams* v. *Tanner*, 244 U. S. 590, 594, this court said: " Because abuses may, and probably do, grow up in connection with this business, is adequate reason for hedging it about by proper regulations. But this is not enough to justify destruction of one's right to follow a distinctly useful calling in an upright way. Certainly there is no profession, possibly no business, which does not offer peculiar opportunities for reprehensible practices; and as to every one of them, no doubt, some can be found quite ready earnestly to maintain that its suppression would be in the public interest. Skilfully directed agitation might also bring about apparent condemnation of any one of them by the public. Happily for all, the fundamental guaranties of the Constitution cannot be freely submerged if and whenever some ostensible justification is advanced and the police power invoked."

Concerning a price-fixing statute, *Tyson and Brother* v. *Banton et al.,* 273 U. S. 418, recently declared: " It is urged that the statutory provision under review may be upheld as an appropriate method of preventing fraud, extortion, collusive arrangements between the management and those engaged in reselling tickets, and the like.  That such evils exist in some degree in connection with the theatrical business and its ally, the ticket broker, is undoubtedly true, as it unfortunately is true in respect of the same or similar evils in other kinds of business.  But evils are to be suppressed or prevented by legislation which comports with the Constitution, and not by such as strikes down those essential rights of private property protected by that instrument against undue governmental interference.  One vice of the contention is that the statute itself ignores the righteous distinction between guilt and innocence, since it applies wholly irrespective of the existence of fraud, collusion or extortion (if that word can have any legal significance as applied to transactions of the kind here dealt with—*Commonwealth* v. *O'Brien & others,* 12 Cush. 84, 90), and fixes the resale price as well where the evils are absent as where they are present.  It is not permissible to enact a law which, in effect, spreads an all-inclusive net for the feet of everybody upon the chance that, while the innocent will surely be entangled in its meshes, some wrong-doers also may be caught."  And see *Adkins* v. *Children's Hospital,* 261 U. S. 525; *Wolff Co.* v. *Industrial Court,* 262 U. S. 522, 537.

*Booth* v. *Illinois,* 184 U. S. 425, much relied upon by counsel for the State, sustained the validity of an Act forbidding options to sell or buy property at a future time, ultimate delivery being intended.  The evident purpose was to prevent gambling contracts.  The Supreme Court of Illinois pointed out that gambling was commonly incidental to dealings in futures, and held the Legislature

might properly conclude that the public interest demanded their suppression as a class in order to avert this evil. This court said: "A calling may not in itself be immoral, and yet the tendency of what is generally or ordinarily or often done in pursuing that calling may be towards that which is admittedly immoral or pernicious. If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the State thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law."

The State also relies upon *Otis* v. *Parker,* 187 U. S. 606; *Purity Extract Co.* v. *Lynch,* 226 U. S. 192; *Rast* v. *Van Deman & Lewis,* 240 U. S. 342; and *Merrick* v. *Halsey & Co.,* 242 U. S. 568. But all those cases recognize the duty of the court to inquire into the real effect of any statute duly challenged because of interference with freedom of contract guaranteed by the Fourteenth Amendment, and to declare it invalid when without substantial relation to some evil within the power of the State to suppress and a clear infringement of private rights.

We need not consider other points advanced by plaintiff in error.

The judgment of the court below must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE HOLMES, MR. JUSTICE BRANDEIS, and MR. JUSTICE STONE dissent.