## NEW STATE ICE CO. v. LIEBMANN.

## SOUTHWEST UTILITY ICE CO. v. SAME.

### Nos. 1107, 1108.

District Court, W. D. Oklahoma.
June 23, 1930.

914

manufacture and sale of ice in said city. The cases are in legal effect and purpose sought the same; were tried and submitted together as one suit, and will be so determined.

The alleged ground on which the injunctions are sought is that defendant has not applied to the Corporation Commission of the state of Oklahoma, paid the fee exacted, and obtained a license for the erection and operation of his plant in said city, as it is contended he must do before he can lawfully engage in the manufacture and sale of ice in the state of Oklahoma. While this is the alleged ground on which the complainants predicate their right to the injunctive relief sought, yet I have no hesitation whatever in stating the true reason for the bringing of these suits is that plaintiffs may further their practical monopoly of the ice business in said city, because they did not invite and do not welcome from defendant competition in their business whether the same be beneficial to purchasers of ice dealing with them or not. While the legislation of the state, presently to be considered, relied upon by complainants, is a part of the anti-trust and anti-monopoly laws of the state, yet no person could hear and consider the proofs in these cases, as I did, and reach any conclusion but that such legislation in actual practice and operation tends of necessity to the creation and perpetuation of monopolies and to the destruction of all competition in the manufacture and sale of ice to consumers. However, this may be, the question presented in these suits is this:

In the year 1925 the Legislature passed an act entitled: "An Act declaring the manufacture, sale and distribution of ice to be a public business, placing same under jurisdiction of the Corporation Commission; providing a license fee, and penalty for violation hereof."

This act of the Legislature referred to is chapter 147 Session Laws 1925, as follows:

"Be It Enacted by the People of the State of Oklahoma:

"Ice—Manufacture and Distribution.

"Section 1. That the manufacture, sale and distribution of ice within the State of Oklahoma is hereby declared to be a public business, as defined by Section 11032, of the Compiled Statutes of Oklahoma.

"Corporation Commission—License.

"Section 2. That no person, persons or corporation shall be permitted to manufacture, sell and distribute ice within the State

Everest, Dudley & Brewer, of Oklahoma City, Okl., for plaintiffs.

Geo. M. Nicholson, of Oklahoma City, Okl., for defendant.

POLLOCK, District Judge.

The facts are the defendant sought to engage in the business of manufacturing and the distribution of ice in the city of Oklahoma City. In pursuance of this purpose he purchased a site and entered upon the construction of buildings suitable to house the machinery and appliances necessary to the proper conduct of this business. However, before he could complete his building, install his machinery and equipment necessary for the conduct of his business, the complainant ice companies engaged in the business of manufacturing and selling ice in the city of Oklahoma City, and having, as shown by the proofs, practically a monopoly of that business in that city, brought the two above entitled and numbered suits for the purpose of enjoining defendant from engaging in the

of Oklahoma without first having secured a license for such purpose from the Corporation Commission of the State of Oklahoma. The license fee hereunder shall be the sum of fifty cents (50¢) per ton, per annum, of the daily capacity of ice manufactured, sold or delivered, but the minimum license shall be five dollars ($5.00). * * *

"Section 7. Any person, firm or corporation who shall engage in the business of manufacturing, selling and distributing ice or engage in either of said businesses, without first obtaining a license, provided for herein shall be guilty of a misdemeanor. and any such person shall be punishable by a fine not to exceed twenty-five dollars ($25.-00), and each day's violation shall constitute a separate offense; provided, the Corporation Commission is hereby authorized to promulgate general orders not in conflict with this Act, and to enforce such orders against any person, firm or corporation, manufacturing, selling or distributing ice or engaging in either of said businesses, by imposing a fine for the violation thereof not to exceed five hundred dollars for each of said violations."

Now, section 11032 of the Laws of Oklahoma, referred to in section 1 above quoted, reads, as follows: "Whenever any business, by reason of its nature, extent, or the existence of a virtual monopoly therein, is such that the public must use the same, or its services, or the consideration by it given or taken or offered, or the commodities bought or sold therein are offered or taken by purchase or sale in such a manner as to make it of public consequence or to affect the community at large as to supply, demand or price or rate thereof, or said business is conducted in violation of the first section of this article, said business is a public business, and subject to be controlled by the State, by the corporation commission or by an action in any district court of the State, as to all of its practices, prices, rates and charges. And it is hereby declared to be the duty of any person, firm or corporation engaged in any public business to render its services and offer its commodities, or either, upon reasonable terms without discrimination and adequately to the needs of the public, considering the facilities of said business."

Now, it will be noted the Supreme Court of the state of Oklahoma in Oklahoma Gin Company v. State, 63 Okl. 10, 158 P. 629, holds section 11032 was construed by the Supreme Court of the state as including only those businesses so conducted as to violate the provisions of section 11017, Compiled Statutes of Oklahoma. Section 11017 of the Compiled Statutes of that state reads: "Every act, agreement, contract, or combination in the form of trust, or otherwise, or conspiracy in restraint of trade or commerce within this State, which is against public policy, is hereby declared to be illegal."

In Shawnee Gas & Elec. Co. v. Corporation Commission, 35 Okl. 454, 130 P. 127, 130, quoting approvingly from an unpublished opinion of Hayes, Justice, it is said: "'This section provides that whenever a business shall have certain characteristics, it shall be a public business, and shall be subject to the jurisdiction of the Corporation Commission to regulate its practices, rates, and prices; but it does not provide that all public business shall be subject in these respects to such jurisdiction. * * * The first part of said section attempts to define the class of business which the latter part of the section subjects to the jurisdiction of the Corporation Commission and the district courts. It appears to us clear that what was intended was to bring within the jurisdiction of the Commission the regulation of charges and rates for services connected with those businesses that violate the act and are connected, not with business strictly of a public character, such as common carriage, supply of water and gas, but with that class of business in which the owners, without any intent of public service, have placed their property in such a position that the public has an interest in its use. The distinction between the class of business and its service intended to be defined by and included in said section and the business and service of public corporations is, we think, well made by Mr. Justice Brewer, who delivered the opinion of the court in Cotting v. Godard, 183 U. S. 79, 22 S. Ct. 30, 46 L. Ed. 92, in the following language: "In the one (referring to property devoted to public service) the owner has intentionally devoted his property to the discharge of a public service. In the other, he has placed his property in such a position that, willingly or unwillingly, the public has acquired an interest in its use. In the one he deliberately undertakes to do that which is a proper work for the state. In the other, in pursuit of merely private gain, he has placed his property in such a position that the public has become interested in its use. In the one it may be said that he voluntarily accepts all the conditions of public service which attach to like service performed by the state itself; in the other, that

he submits to only those necessary interferences and regulations which the public interest required." It was this second class of business with which we think section 13 was dealing and intended to place under the jurisdiction of the Corporation Commission and the district courts of the state as to all practices, rates, and charges. * * * The Act confers, not only upon the Corporation Commission jurisdiction to prescribe rates and charges under the conditions therein named, but confers also a like and concurrent power upon the district courts of the state.'"

So limited as was done in this case by the Supreme Court of Oklahoma there can be no possible objection to this legislation under consideration. But, if we treat this legislation as broadly declaring all manufacturing and distribution of ice plants to be public utilities because so declared by the lawmaking power of the state, and this is the contention made by complainants in these cases, far different and far more difficult questions arise. The question then presented arises over the power of the lawmaking branch of the state, regardless of the circumstances and conditions, by its mere ipse dixit to make all ice manufacturing plants public utilities, conducting a public business, entirely at the beck and call of the Corporation Commission of the state. I cannot agree with this position, and for the following reasons:

■ The lawmaking body of the state or nation does not possess the power to make a thing in name what in fact and its essential nature it is not. It has often been declared, in decisions controlling here, a state by its legislation has not the power of declaring a business to be a public utility or a business affected wih a public use, and thus controllable, as seen fit, by the lawmaking power which in its true nature is not such a business. Thus, in the case of Lawton v. Steele, 152 U. S. 135, 14 S. Ct. 499, 501, 38 L. Ed. 385, Mr. Justice Brown, delivering the opinion for the court, said: "To justify the state in thus interposing its authority in behalf of the public, it must appear—First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination

as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts."

In Wolff Co. v. Industrial Court, 262 U. S. 522, 43 S. Ct. 630, 633, 67 L. Ed. 1103, 27 A. L. R. 1280, Mr. Chief Justice Taft, delivering the opinion for the court, said:

"It is urged upon us that the declaration of the Legislature that the business of food preparation is affected with a public interest and devoted to a public use should be most persuasive with the court, and that nothing but the clearest reason to the contrary will prevail with the court to hold otherwise. [Citing several cases.] These cases are not especially helpful in determining how a business must be devoted to a public use to clothe it with a public interest so as to permit regulation of rates or prices. * * *

"It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator, or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by state regulation. It is true that in the days of the early common law an omnipotent parliament did regulate prices and wages as it chose, and occasionally a colonial legislature sought to exercise the same power; but nowadays one does not devote one's property or business to the public use or clothe it with a public interest merely because one makes commodities for, and sells to, the public in the common callings of which those above mentioned are instances. * * *

"It is very difficult under the cases to lay down a working rule by which readily to determine when a business has become 'clothed with a public interest.' All business is subject to some kinds of public regulation, but when the public becomes so peculiarly dependent upon a particular business that one engaging therein subjects himself to a more intimate public regulation is only to be determined by the process of exclusion and inclusion and to gradual establishment of a line of distinction. We are relieved from considering and deciding definitely whether preparation of food should be put in the third class of quasi public businesses, noted above, because, even so, the valid regulation to which it might be subjected as such, could not include what this act attempts.

"To say that a business is clothed with a public interest is not to determine what regulation may be permissible in view of the private rights of the owner. The extent to

which an inn or a cab system may be regulated may differ widely from that allowable as to a railroad or other common carrier. It is not a matter of legislative discretion solely. It depends on the nature of the business, on the feature which touches the public, and on the abuses reasonably to be feared. To say that a business is clothed with a public interest is not to import that the public may take over its entire management and run it at the expense of the owner. The extent to which regulation may reasonably go varies with different kinds of business. The regulation of rates to avoid monopoly is one thing. The regulation of wages is another. A business may be of such character that only the first is permissible, while another may involve such a possible danger of monopoly on the one hand, and such disaster from stoppage on the other, that both come within the public concern and power of regulation."

In Tyson & Brother v. Banton, 273 U. S. 418, 47 S. Ct. 426, 428, 71 L. Ed. 718, 58 A. L. R. 1236, Mr. Justice Sutherland, delivering the opinion for the court, said:

"A business is not affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance. Nor is the interest meant such as arises from the mere fact that the public derives benefit, accommodation, ease, or enjoyment from the existence or operation of the business; and, while the word has not always been limited narrowly as strictly denoting 'a right,' that synonym more nearly than any other expresses the sense in which it is to be understood. * * *

"And, finally, the mere declaration by the Legislature that a particular kind of property or business is affected with a public interest is not conclusive upon the question of the validity of the regulation. The matter is one which is always open to judicial inquiry."

In Fairmont Co. v. Minnesota, 274 U. S. 1, 47 S. Ct. 506, 508, 71 L. Ed. 893, 52 A. L. R. 163, Mr. Justice McReynolds, delivering the opinion for the court, said: "The real question comes to this—May the State, in order to prevent some strong buyers of cream from doing things which may tend to monopoly, inhibit plaintiff in error from carrying on its business in the usual way heretofore regarded as both moral and beneficial to the public and not shown now to be accompanied by evil results as ordinary incidents? Former decisions here require a neg-

ative answer. We think the inhibition of the statute has no reasonable relation to the anticipated evil—high bidding by some with purpose to monopolize or destroy competition. Looking through form to substance, it clearly and unmistakably infringes private rights, whose exercise does not ordinarily produce evil consequences, but the reverse."

Quoting from Adams v. Tanner, 244 U. S. 590, 37 S. Ct. 662, 61 L. Ed. 1336, L. R. A. 1917F, 1163, Ann. Cas. 1917D, 973, the court continues: "Because abuses may, and probably do, grow up in connection with this business, is adequate reason for hedging it about by proper regulations. But this is not enough to justify destruction of one's right to follow a distinctly useful calling in an upright way. Certainly there is no profession, possibly no business, which does not offer peculiar opportunities for reprehensible practices; and as to every one of them, no doubt, some can be found quite ready earnestly to maintain that its suppression would be in the public interest. Skilfully directed agitation might also bring about apparent condemnation of any one of them by the public. Happily for all, the fundamental guaranties of the Constitution cannot be freely submerged, if and whenever some ostensible justification is advanced and the police power invoked."

From the foregoing cases controlling here, if complainants contend the lawmaking power had declared an ice manufacturing plant and the distribution of ice therefrom within the territorial limits of the state of Oklahoma (in the light of other statutory enactments heretofore alluded to) is a public utility, and they further contend such declaration is binding and conclusive, regardless of the true nature of the business conducted, such contention must be denied. On the contrary, it must be held whether an ice manufacturing plant and the distribution of ice therefrom is a public utility business is a question of law for the court, and, if it be a public utility in a certain sense, the nature and the extent of the regulation imposed, whether reasonable and necessary or unreasonable and arbitrary, under all the facts and circumstances of the case, is further a question of law for the court. Now, under the proofs in the instant cases it is clearly shown the act of the Legislature here under consideration in its actual operation and effect has had the result in many cities and towns of the state of absolutely destroying all competition in the manufacture and distribution of ice. It further appears the act

918

has had in actual operation the effect of enhancing the price charged by the ice plants to the consumers of ice when and where competition has been eliminated. While it is shown there are more ice plants engaged in the business of manufacturing and distributing ice in Oklahoma City than there were at the date the statute was enacted, yet, while there are more plants, there are less owners of these plants. Again, while it does not appear from the proofs in these cases that the true motive and intent of these suits is to obtain an injunctive decree against the defendant because the operation of his plant will bring competition with complainants, yet, judging the complainants by the same rules we judge ordinary business corporations, it must be true complainants would not invite the competition the operation of defendant's plants will bring them. It must be true some reasonable competition in the manufacture and distribution of ice in Oklahoma City will result to the benefit and not the detriment of the population of that city. The manufacture and sale of a commodity such as ice is a useful and honorable private business and calling in which any citizen so disposed has the undoubted right under our Constitution and laws to engage by investing his capital and selling his time and energy, at any time, and in any suitable and convenient place his judgment may dictate to him. If he builds up a monopoly and his charges for his product become excessive or exorbitant, and he is not induced to reduce them by competition, I have no doubt as to the power of the state to correct such abuses, but such is not the power of regulation attempted to here be imposed. In these cases defendant has devoted his money to the purpose of the construction and operation of an honest, legitimate, personal manufacturing business in Oklahoma City, a project one would believe any such young, industrious, wide-awake growing city as Oklahoma City would welcome with outstretched arms and glad hearts. In attempting this business, at the very threshold of his endeavor complainants arise and inform him he may not engage in his chosen occupation in Oklahoma City unless and until he makes his application to the 'Corporation Commission of the state and pays for and procures permission in the shape of a license from that body to engage in such personal business within the state, no matter whether the people of the city much desire this new enterprise to be conducted in their city or not. Now, the very power that requires defendant to petition the Corporation Commission of the state to grant him a permit in the shape of a license to conduct this business embodies the power, if such license is lawfully required, to forever exclude him from the conduct of such business. Not only that, if he has the hardihood to proceed without the license, to subject him to extreme fines and penalties as a lawbreaker. To my mind, to uphold such legislation in cases of this character, brought and conducted from the indisputable motives, and under all the facts and circumstances of these cases, would be, as said by the great and wise jurist, Mr. Justice Bradley: "This will be running the public interest argument into the ground." And, as said by Mr. Chief Justice Taft: "It will be impossible to reconcile such result with the freedom of contract and of labor secured by the Fourteenth Amendment.

It follows, to my mind, the bills of complaint are without equity and must be dismissed for that reason.

It is so ordered.