145 F.2d 836 (1944)
SAFEWAY STORES, Inc.,
v.
BOWLES, Price Adm'r.
Nos. 111, 150.
United States Emergency Court of Appeals.
Heard September 25, 1944.
Decided November 29, 1944.
Writ of Certiorari Denied February 26, 1945.
*837 Elisha Hanson, of Washington, D. C. (Eliot C. Lovett, of Washington, D. C., on the brief), for complainant.
Nathaniel L. Nathanson, Associate Gen. Counsel, of Washington, D. C. (Richard H. Field, Gen. Counsel, and John O. Honnold, Jr., and James A. Durham, Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.
Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.
Heard at Washington September 25, 1944.
Writ of Certiorari Denied February 26, 1945. See 65 S.Ct. 684.
MARIS, Chief Judge.
The complainant is a Maryland corporation with its principal offices in Oakland, California. It owns and operates as a single corporate entity more than 2300 retail food stores in 23 states of the United States and in the District of Columbia. In all of these stores the complainant sells, inter alia, dry groceries, soaps, cleansers, fresh fruits and vegetables, at retail. The majority of the stores had a total sales volume for the year 1942 of less than $250,000 per store. It has been the complainant's publicly advertised and consumer accepted policy to maintain the same prices on the same commodities in all its stores in the same trading area.
The complaint in No. 111 is based upon protests to Maximum Price Regulation 390[1] and Maximum Price Regulation 422.[2] The complaint in No. 150 is based upon protests to Revised Maximum Price Regulation 271,[3] Maximum Price Regulation 421,[4] Maximum Price Regulation 426[5] and General Order 51, Amendment 2.[6] All six protests having been consolidated and denied, both complaints are before this court upon a single transcript of the proceedings before the Price Administrator.
Maximum dollars and cents prices for all household soaps and cleansers sold at retail food stores were established by MPR 390. For the purpose of fixing prices retail food stores were classified into four different groups. Groups 1, 2 and 3 were classified upon the basis of the type of ownership and the volume of sales. Group 4 was classified solely upon the basis of volume of sales. Thus Group 1 is comprised of independent stores with a sales volume of less than $50,000; Group 2 of independent stores with a sales volume of $50,000 or more but less than $250,000; and Group 3 of chain stores (that is, stores included in a group of four or more under common ownership whose combined 1942 sales totalled $500,000 or more) which individually have a sales volume of less than $250,000. Group 4 is comprised of all stores with a sales volume of $250,000 or more, whether independent or part of a *838 chain store organization. The Administrator adhered to this classification in other regulations here involved. In MPR 422 he established percentage markups to be used by Group 3 and Group 4 stores in determining the ceiling prices to be charged by them for certain dry groceries and perishables listed in the regulation. In MPR 423 the Administrator established percentage markups to be used by Group 1 and Group 2 stores. Generally the markup for Group 4 is lower than for Group 3 and in most instances the markup for Group 3 is lower than for Groups 2 and 1. The complainant's stores fall within Groups 3 and 4.
The complaints now before us present three major questions for our consideration. The first is as to the validity of the classification of retail food stores by sales volume and type of ownership which was made by the Administrator and incorporated into the regulations under attack. We shall proceed to consider this question but before doing so we must answer the preliminary question as to whether it was unreasonable to classify retail food stores at all.
The complainant contends that the Administrator erred in failing to follow the recommendation of representative members of the retail food industry that he establish "one ceiling price only  highest level". The complainant's contention thus is that the Administrator should have adopted a single ceiling price for each food commodity in each marketing area and should have selected as the ceiling price the highest level retail price current in the area. It is not disputed by the complainant that price differentials between different types of retail food stores in the same marketing area existed in the industry before price control. Its contention appears to be that the Administrator should not have attempted to carry these differentials into his maximum price regulations but should have fixed the maximum prices at the highest prewar levels and permitted economic forces of competition to operate under those levels.
The Administrator asserts, and we think with good reason, that such action on his part would have thwarted the purposes of the Emergency Price Control Act and would have opened the way to a very substantial inflationary increase in the cost of food products since it would have permitted the vast multitude of low-cost food stores to increase their existing levels of prices to those of the highest price stores in their respective communities. The complainant's contention that the forces of competition would have prevented such price increases loses its force when we consider that such factors do not operate normally in an economy of scarcity coupled with excess purchasing power such as obtains under war conditions in this country at the present time. It might have been equally disastrous for the Administrator to have placed a single price ceiling on food products at less than the highest level. Such action might well have forced a large number of small neighborhood retail food stores out of business entirely.
It is significant to note that at hearings held by the Committee on Banking and Currency of the House of Representatives in 1944[7] counsel for the Food Industry War Committee stated with reference to the proposed single price ceiling for retailers:
"We do not think that is a sound recommendation, because the Administrator may be driven to have an average price that will be too low for the highest price fellow and too high for the lowest, or be driven to too high a ceiling, if you were fair to the little fellow, so we do not recommend the extreme position."
Retail food prices were first brought under price ceilings by the General Maximum Price Regulation.[8] By that regulation each retail store's food prices were based upon its prices during March, 1942. Thus the original control of retail food prices imposed by the Administrator retained intact all the existing price differentials as among the individual food stores. By the classification incorporated into the regulations here under attack the Administrator sought to retain, so far as administratively feasible, these existing differentials. For him at that time to have adopted a single price ceiling would have been to make a radical departure from the scheme of price regulation then in force. We conclude that the Administrator's refusal to adopt such a course was neither arbitrary nor capricious. We, therefore, turn to the question whether the particular classification which the Administrator adopted was, as the complainant urges, arbitrary and capricious.
*839 The complainant's contention is that, assuming the prewar existence of different classes of retail food stores and conceding that some classification of retail food stores is appropriate for price control purposes, the classification should have been on the basis of the services rendered and not upon the basis of the volume of sales or the type of ownership. In support of the complainant's position is the fact that among the well known existing types of retail food stores are small independently owned and operated neighborhood stores which normally render over-the-counter service, make deliveries and extend credit; larger stores, both independent and chain, which render over-the-counter service but ordinarily do not make deliveries or extend credit; and very large stores, commonly known as supermarkets, which render a minimum of over-the-counter service, make no deliveries and extend no credit. The complainant points to these variations in the services rendered by the stores as the proper criterion for classification.
It is common knowledge that in the prewar economy the small individually owned neighborhood stores which provided the maximum of service charged the highest prices; the chain store of the cash and carry type but with over-the-counter service charged lower prices; and the supermarkets with little or no service charged the lowest prices.[9] It is, therefore, clear that the amount of service rendered by a store has a direct relation to prices charged by it and it would thus appear that the amount of service rendered would, if administratively practicable, be a suitable criterion for the classification of retail food stores. The Administrator does not deny this but points out that classification upon the basis of service would be wholly unworkable from an administrative standpoint because of the great degree of variation in services offered. For example, some retail stores offer credit to all customers, whereas others offer credit to a select list only. Even in the same store practices as to self service, delivery and extension of credit may vary from department to department. We must, therefore, conclude that, although classification upon the basis of the quantity and quality of services rendered would have been reasonable had the Administrator found a practicable method to utilize it in his regulations, his decision against the use of such a basis was not an unreasonable exercise of his administrative discretion. The question remains whether the Administrator's classification on the basis of sales volume and ownership follows actual lines of classification in the industry as it was carried on before price control to such an extent as to render it reasonable or whether it was so inappropriate as to be arbitrary and capricious.
It appears that the classification adopted by the Administrator represented a combination of a number of pre-existing classifications which had been developed by others for the purpose of solving food distribution problems or which appeared from the study of conditions prevailing in the retail food industry.[10] In support of his classification the Administrator points to evidence that chain stores before the war sold on the average at prices lower than the prices charged by independent retailers,[11] and that in all stores sales volume had a direct bearing upon the prices charged.[12] The validity of each of the criteria for classification chosen by the Administrator appears also to be supported by the results of the food margins study made for him in 1942 by the Bureau of Labor Statistics of the Department of Labor. We shall have occasion to discuss this study in greater detail at a later point. At this point we merely note that in gathering the data included in the study the Bureau of Labor Statistics used the classification of food stores subsequently incorporated by the Administrator into the regulations and that according to the Administrator's statement, which was not denied by the complainant whose accountants had examined the voluminous results of the study in detail, the *840 results showed distinct differentials existing in the prices of many food products among the various classes of retail food stores studied. In the light of all the evidence and of the facts of which we may take judicial notice we think that the Administrator's classification based on the amount of sales and type of ownership was neither arbitrary nor capricious.
The complainant urges that by means of the protested classification the Administrator has compelled a change in the complainant's business practices in violation of Section 2(h) of the Emergency Price Control Act.[13] The complainant's stores, as we have seen, fall within Groups 3 and 4. The Administrator has established dollars and cents prices for many commodities and percentage markups for many others which are lower for Group 4 stores than for Group 3 stores. The complainant urges that since as a matter of business policy it has maintained the same prices on the same commodities in all its stores in the same trading area, irrespective of the total sales volume of each store, it follows that the Administrator has used his powers so as "to compel changes in the business practices, cost practices or methods," of the complainant, contrary to Section 2(h) of the act.
Assuming that the complainant's one price policy is a business practice within the meaning of Section 2(h) and not simply a pricing policy, it is clear that Section 2(h), which prohibits the Administrator from compelling changes in the business practices "in any industry", is not applicable to a situation involving the business practices of but one member of that industry. Moreover we find no compulsion upon the complainant to change its policy of charging one price in all its stores. By virtue of its own much advertised policy it is committed to selling its products at the lowest lawful prices charged by its competitors within the same trading area. It may continue to do so under the protested regulations by charging in each of its stores the price established for a Group 4 store, without regard to the particular classification of the store. Indeed it would appear that this is exactly what its established policy would require it to do in any event.
Nor do we see any merit in the complainant's suggestion that although the majority of its stores fall in Group 3 it will be compelled to reduce all its prices to the ceilings established for Group 4 stores because statutes in many states in which it operates prohibit chain store organizations from charging different prices on the same commodities in the same trading area. The statutes cited by the complainant prohibit the charging of different prices when the purpose is to destroy competition.[14] Here again it must be recalled that the prices established by the regulations are merely the ceiling. The complainant may, therefore, continue to adhere to its advertised one price lowest-price policy without fear of violating either the regulations or the cited state statutes. We conclude that the classification of retail food stores employed under the regulations is neither arbitrary, capricious nor contrary to law.
The second question raised by the complainant is as to the validity of the price differentials which the Administrator incorporated into the regulations in question. In MPR 422 the Administrator established maximum prices for Group 3 and Group 4 stores for about 55 listed commodities by the use of percentage markups for some commodities and dollars and cents markups for others.[15] He did the same for Group 1 and Group 2 stores in MPR 423. A comparison of the two regulations discloses that the markups are less for 44 of the listed commodities for Group 3 and Group 4 stores than for Group 1 and Group 2 stores. The Administrator states that he established the differentials only in the cases of those commodities as to which the results of the food margins study made for him by the Bureau of Labor Statistics revealed material differences between prevailing margins in the various classes of *841 stores. Otherwise the markups for each group were the same.
Complainant does not attack the validity in theory of the method employed by the Administrator in determining on the basis of historical margins the markups to be established by the regulation. It does, however, attack the food margins study itself as furnishing an inadequate basis for determining the historical margins. It also attacks the Administrator's methods of fixing the maximum permissible markups as mysterious and unsound because in some instances the results of the food margins study were subjected by him to modifications in order to achieve his markups and in other cases the results of the study were abandoned entirely upon grounds of policy.
Most of the criticisms of the adequacy of the food margins study which are now asserted by the complainant were contained in a report made to it by Peat, Marwick, Mitchell & Co., the accountants which it had retained to examine the data in the possession of the Administrator, and were answered by the Acting Commissioner of Labor Statistics. We have examined these criticisms in detail. It will serve no useful purpose to discuss them here. It is enough to say that we find them to be without merit. On the contrary we are impressed with the skill and care with which the enormous task of collecting and collating the data involved in the food margins study was carried through.
The complainant next argues that the Administrator did not construct his markups upon the basis of the actual historical margins revealed by the food margins study but rather modified and changed the results of the study by the application thereto of an arbitrary statistical procedure. The Administrator admits that he did apply a certain statistical procedure to modify and interpret the results of the food margins study. He denies, however, that the procedure which he followed was arbitrary. On the contrary he points out that it was necessary to follow some such procedure in order to eliminate from the data upon which he proposed to base his markups the effect of the abnormally low margins of some of the stores from which the data were collected and the abnormally high margins of others. These abnormal margins appeared in the data because the study covered a period in which many stores had suffered a "squeeze" between existing price ceiling and rising costs, while others had been able to secure speculative and unprecedented margins.
The complainant recognizes that some of the data received in the food margins study reflected such abnormal margins and that it was appropriate for the Administrator to eliminate these abnormal margins from consideration. The complainant suggests that the Administrator should have arrived at his markups by taking in the case of each commodity the typical percentage[16] of margins shown by the food margins study as the historical margin. This undoubtedly is a recognized statistical measure of central tendency. We agree with the Administrator, however, that its use would not have eliminated the effect of abnormalities in the data under scrutiny. We are thus left without any suggestion by the complainant of a statistical procedure which would have been better calculated to achieve the desired result than the one which was used by the Administrator.
The method which the Administrator used involved the preparation from the food margins data for each commodity group of a curve showing graphically the percentage distribution of margins disclosed by the data. In many cases these frequency curves disclosed more than one apex and it became necessary for the Administrator to determine the point on the curve which represented the normal margin unaffected by "squeeze" or speculation. It was to aid him in this task that he developed the procedure to which the complainant objects. Very briefly stated this was to superimpose upon the curve under examination another frequency distribution curve which had comparable characteristics but a well defined apex and which related to a commodity which the Administrator determined after study to be wholly free from the influence of any abnormal margins either high or low. With the aid of this superimposed curve the Administrator determined the point on the curve under examination which represented the normal historical margin.
In his opinion filed June 1, 1944,[17] and in his answer to the complainant's interrogatory *842 No. 19[18] the Administrator described in detail the procedure which he followed in this connection. We have carefully considered this procedure in the light of the complainant's criticism but we have not been persuaded that the Administrator was guilty of arbitrary action in selecting it or that its application by him to the results of the food margins study has been shown to have produced capricious results.
It must be realized that the Administrator was here dealing with a most difficult statistical problem. He employed for its solution a procedure which he deemed suitable and no better method has been suggested by the complainant. Moreover it must be remembered that the food margins study was carried through to aid the Administrator in the exercise of his judgment and not to provide a substitute for that judgment. Consequently it may not be argued that the Administrator should have used all the results of the food margins study without modification if he used any of them. For him to have done so would have been to abdicate the duty imposed upon him by the act, which was to fix those maximum prices which in his judgment were generally fair and equitable and were such as would effectuate the purposes of the act. It was the duty of the Administrator to exercise his judgment in the light not only of the food margins study but also of all other information which he had or could obtain bearing upon the problem before him.
What has just been said disposes of the complainant's contention that in fixing some of his markups the Administrator wholly ignored the results of the food margins study. In the absence of a showing that the particular markup under attack was not generally fair and equitable or such as would effectuate the purposes of the act, such a contention is in reality merely a charge that the Administrator exercised his judgment in fixing the markup in question. It is, therefore, wholly without merit.
The third question raised by the complainant is as to the adequacy of the markups established by the Administrator to compensate the complainant for expenses incurred by it in the performance of so-called "pre-retail" functions. The complainant is a retailer but has widened the field of its activities to include many of the functions ordinarily performed by commission merchants or brokers, carlot distributors and service wholesalers. Thus it purchases much of its fresh fruits and vegetables directly from the growers and for that purpose establishes and maintains seasonal buying and shipping offices close to the source of supply. It performs all the functions necessary to preserve and transport these commodities in saleable condition. It maintains its own warehouses in many sections of the United States. At these warehouses it receives and inspects all supplies of fresh fruits, vegetables, canned foods and packaged food. It cares for and stores these foods, assembles the orders received from its retail stores, loads them on trucks and makes deliveries. It sorts, trims and bags the fresh fruits. It assembles dry groceries. It bags into retail packages dry beans, rice, macaroni and dried fruits.
The complainant contends that the markups permitted it by MPR 422 fail to compensate it for expenses incurred by it in performing many of the above enumerated functions both before and after the commodities are received in the warehouses. It urges, moreover, that the denial of compensation for such services is particularly discriminatory because others are given allowances for identical functions and services by MPR 271, MPR 421 and MPR 426, each of which has been ruled to be inapplicable to the complainant because it as a corporation does not "sell" to its own retail stores.
Although it does not say so in express terms the complainant's position is that the burden is upon the Administrator to prove that the markups are adequate to compensate the complainant for all functions which it performed from the date of the purchase of the commodities to the actual sale to the customer at the retail stores and that since the administrator admits that in certain specific instances the markups are inadequate the regulation as a whole must fall. The Administrator, on the other hand, urges that it most cases the markups are adequate to compensate for all functions and services performed by retailers since they were based upon the historical margins which reflected the retail food industry's own determination as to what was an adequate return to compensate for cost and expenses and to return a profit.
When, however, the Administrator's study subsequent to the promulgation of *843 MPR 422 convinced him that the margins did not adequately reflect an allowance for some particular distributive function performed by the complainant or others he amended the regulation so as to provide an allowance. Thus it appears that prior to the conclusion of the protest proceedings the Administrator on five different occasions made provision by amendment to MPR 422 to compensate chain stores for services performed prior to the time goods are delivered to the chain store warehouse and for special services wherever performed.[19]
The Administrator stated in his opinion of June 1, 1944:[20]
"It does not specifically appear from the protests that Protestant performs any pre-warehousing functions for which no allowance is now made in Maximum Price Regulation No. 422. However, the Price Administrator stands ready at any time to make any further appropriate adjustments in the Regulation upon a proper showing that they are necessary to fair and effective price control, and at the present time is re-examining Maximum Price Regulation No. 422 with this purpose in view."
This practice of providing special allowances when and as it appears that the services are otherwise uncompensated has been consistently followed by the Administrator since the present complaints were filed in this court. Prior to the hearing of these cases in this court the Administrator by four separate amendments[21] provided retailers with added compensation for special distributive services. Subsequent to the hearing the Administrator again amended[22] MPR 422, this time to provide special compensation for the purchase of fresh fruits and vegetables from country shippers and certain other sellers.
The Administrator's theory and practice in this regard are epitomized in the statement of considerations involved in the issuance of Amendment 32 to MPR 422. The Administrator there points out that under MPR 422 the retailer determines a ceiling price by applying to net cost a prescribed maximum markup. Net cost includes the amount the retailer pays his supplier, plus transportation charges. The Administrator originally took the position that the maximum markup to be applied to the net cost would provide adequate compensation for the expenses involved in the usual handling of fresh fruits and vegetables. This was in the belief that the margins which he used as a guide in constructing his markups reflected in part those expenses. However, further study convinced the Administrator that this was not a justifiable assumption in all instances. He found that of the retailers whose margins were collected by the Bureau of Labor Statistics the greatest number handling the greatest percentage of merchandise purchased their supplies of fresh fruits and vegetables in less than carlot and less than trucklot quantities from independent intermediate sellers and produce wholesalers. In such cases the data collected comprised the cost of the fruits and vegetables at the retailer's warehouse and the selling price out of the retailers' store. The margin in such cases did accurately reflect the function performed by such retailers between the entry of the fruits and vegetables into the warehouse and the sale at retail. The expenses of any function performed by prior handlers were included in the cost of the commodities entering the warehouse. The food margins study gave little weight, however, to the data reported by integrated chain stores purchasing fresh fruits and vegetables from growers or country shippers.
The Administrator concluded from this that the maximum markups did not fully reflect the expenses incidental to purchasing fresh fruits and vegetables in large quantities at an early stage in the distribution process. He, therefore, amended MPR 422 so as to permit those Group 3 and Group 4 retailers which purchase fresh fruits and vegetables from country shippers in carlot or trucklot quantities an allowance of 1½ per cent of the net cost of the commodities.[22]
The complainant urges that despite the numerous amendments to MPR 422 there still remains the question of an adequate and equitable allowance for the pre-retail functions and services performed after the commodities are received in the complainant's *844 warehouses and until they are actually delivered to the complainant's retail outlets and for those pre-warehouse functions performed for commodities (not processed or manufactured by complainant) other than fresh fruits and vegetables. We think that the burden was on the complainant to show that the margins upon which the markups under attack were constructed did not historically reflect the specific function or service in question. This it has wholly failed to do. We, therefore, cannot hold the regulations invalid on this ground.
One more contention of the complainant must be noted in this connection. The complainant urges that certain food store chains, which perform their pre-retail functions by means of separate corporate affliates, can thereby procure compensation for the expenses incurred which the complainant cannot receive because it does not employ corporate affiliates for the purpose. Amendment 31 to MPR 422,[23] however, expressly provides that where commodities sold by a retail organization are purchased from a corporate affiliate, the retail markups must be applied to the net cost of the affiliate first purchasing the commodity. There can, therefore, since this amendment, be no discriminatory advantage to those retail chain organizations which purchase through a corporate affiliate.
We have discussed in detail the three principal questions raised by the complainant. Certain general considerations which are applicable to all three may, therefore, now be stated.
The complainant's objection to the classification of retail food stores upon the basis of sales volume and type of ownership, with ceiling prices which differ between classes, its criticisms of the Bureau of Labor Statistics food margins study and of the use made by the Administrator of the results of the study, the proposal of the retail food industry that the Administrator establish a single ceiling price for each separate commodity, and the alleged discrimination of the Administrator in permitting allowances for expenses incurred in performing pre-retail functions to some while denying such allowances to the complainant, were all specifically brought to the attention of Congress during its consideration of the Stabilization Extension Act by the attorney who appeared for the complainant in this court. He appeared as a witness before the Committee on Banking and Currency of the House of Representatives,[24] and after discussing these matters in detail he proposed several amendments to the Emergency Price Control Act. Specifically he suggested to the committee that Congress should add as a proviso to Section 2(c) of the Emergency Price Control Act the following:
"Provided, however, That there shall be no classifications or differentiations by volume of business or otherwise within any group performing the same or substantially the same functions or services: And provided further, That, in determining or regulating any price or prices, consideration shall be uniformly given to all services and functions performed so that any compensation allowance made or to be made therefor shall be realized by or be made available to any person or persons performing them."[25]
Nevertheless, although Congress did by the Stabilization Extension Act amend Section 2(c), 50 U.S.C.A.Appendix § 902(c), in some respects not here relevant, it did not adopt the amendment proposed by counsel for the complainant or any other amendment to similar effect. The failure of Congress to change a statute when alleged faults in the statute are brought to its attention at committee hearings has been held to be of special significance in the construction of the statute. Corn Exchange Nat. Bank & Trust Co., Philadelphia, v. Klauder, 1943, 318 U.S. 434, 63 S.Ct. 679, 87 L.Ed. 884, 144 A.L.R. 1189. We think that the legislative history to which we have referred indicates quite clearly that Congress did not regard the regulations here under attack as out of harmony with the purposes of the Emergency Price Control Act or beyond the authority which had been delegated to the Administrator by the act.
We think also that the present controversy assumes a certain air of unreality when the operating experience of the industry in general and of the complainant in particular under the protested regulations is examined. Thus it appears that the annual net profits before taxes of 12 of the *845 largest retail food store chains, among which is the complainant, were:

 Average 1936-1939 $14,494,000
 1940 19,619,000
 1941 29,187,000
 1942 37,361,000
 1943 35,633,000

Profits for 1943 for this representative section of the industry were, therefore, 146% greater than for the average of the years 1936-1939. The data as to the complainant's profits before taxes and during price control is equally illuminating:

 Average annual earnings 1936-39 $5,520,000
 ½ of 1936-39 average 2,760,000
 First half 1943 3,166,910
 Second half 1943 5,291,036
 First half 1944 6,062,256

The complainant's 1943 net profits before taxes were 53% in excess of its average yearly net profits before taxes for the years 1936-1939. The complainant's net profits for the first six months of 1944, during which retail markup price control had been extended to cover nearly all items sold by retail food stores, were almost twice the profits for the first six months of 1943. In the light of these results it is not difficult to understand why complainant does not attempt to show that it has been harmed by the classifications which it contends were arbitrary, by the markups which it argues were unfair and discriminatory or by the action of the Administrator which it characterizes as capricious.
One final observation should be made. The Administrator opened up to the complainant his entire files on the food margins study. He explained in detail the procedures which he had followed in using the data disclosed by that study for the determination of the markups which he incorporated into the regulations here under review. The complainant has made a major attack upon this study and these procedures and the Administrator has joined issue by defending them on their merits. We have, therefore, thought it right to consider them in detail and, having decided that the complainant's contentions with respect to them are without merit, we have concluded that the complaints must be dismissed. But in disposing of the cases on these grounds we do not overlook the fact that the complainant has not shown that the markups which the Administrator finally incorporated into the regulations, after considering the data and carrying through the procedures which the complainant attacks, were themselves not generally fair and equitable or such as would effectuate the purposes of the act. On this ground alone the complaints would have to be dismissed. For if in determining the markups the Administrator exercised his judgment and complied with the mandatory procedural requirements of the law, as the record shows that he did, we do not think that we would have power to set the regulation aside upon the ground that the data upon which or the procedures by which he arrived at his judgment were inadequate or unsatisfactory, unless we also found that the markups themselves were not generally fair and equitable or that they were not calculated to effectuate the purposes of the act.
It must be remembered that the Emergency Price Control Act imposed upon the Administrator the Herculean task of stabilizing the price structure of a great nation and of doing so with unprecedented speed under the immediate threat of inflation. We think that under such circumstances the Administrator is entitled to be judged by the results of his acts and not to be subjected retrospectively in the calm of the judicial study to a hypercritical appraisal of the reasonableness of each of the steps by which, under the stress of the emergency, his acts were decided upon. It is enough if in the exercise of judgment he has promulgated regulations which are generally fair and equitable and are such as will effectuate the purposes of the act. The complainant in the cases now before us, however, does not seek to prove that the Administrator wholly failed to exercise the faculty of judgment in determining upon the regulations here under attack or that the maximum prices which those regulations established are not in their operation and effect generally fair and equitable nor does the record before us contain any evidence which would support a finding to that effect.
A judgment will be entered dismissing the complaints.
NOTES
[1] 8 F.R. 6428.
[2] 8 F.R. 9395.
[3] 8 F.R. 7017.
[4] 8 F.R. 9388.
[5] 8 F.R. 9546.
[6] 8 F.R. 8690.
[7] Hearings on H.R. 4376, 78th Cong. 2d Session, Volume 1, page 408.
[8] 7 F.R. 3153.
[9] As to supermarkets see Monograph No. 35 of the Temporary National Economic Committee on Investigation of Concentration of Economic Power, Senate Committee Print, 76th Cong., 3d Sess., Large Scale Organization in the Food Industries, pp. 10, 11.
[10] See opinion of the Administrator filed November 23, 1943, denying complainant's protests. 1 O.P.A. Opinions and Decisions, p. 467.
[11] See Federal Trade Commission, Final Report on Chain Stores, Senate Doc. 4, 74th Cong., 1st Sess. (1935) pp. 28, 30.
[12] See Walter A. Foy, Regional Business Consultant, Chicago Regional Office, U. S. Department of Commerce, Effects of General Maximum Price Regulations on Retailers in the Chicago-Detroit Area, 30 Domestic Commerce No. 15, pp. 6-8 (October 8, 1942).
[13] 50 U.S.C.A. Appendix § 902(h).
[14] Great Atlantic & Pacific Tea Co. v. Ervin, 8 Cir., 1938, 23 F.Supp. 70 and Fairmont Creamery Co. v. State of Minnesota, 1927, 274 U.S. 1, 47 S.Ct. 506, 71 L.Ed. 893, 52 A.L.R. 163, make it clear that unless directed to the elimination of unfair competition, such statutes would be unconstitutional. See also annotation in 118 A.L.R. 506.
[15] As used by the Administrator "margin" is the difference between cost and selling price; in percentage form it is the percentage that this difference is of the selling price. "Markup" is the percentage which the margin is of the cost. Thus if the cost is $0.80 and the selling price is $1.00 the margin is $0.20 or 20% and the markup is 25%.
[16] The complainant uses the term "typical percentage" to mean the average of the middle half of the percentages of margin when these percentages are arranged in order of magnitude.
[17] 2 O.P.A. Opinions and Decisions, p. ___.
[18] Supplemental Transcript of Proceedings, pp. 303-308.
[19] Amendment 4, 8 F.R. 12611; Amendment 6, 8 F.R. 15251, 17369; Amendment 10, 8 F.R. 17370; Amendment, 12, 9 F. R. 3510; Amendment 15, 9 F.R. 4214.
[20] 2 O.P.A. Opinions and Decisions, p. ___.
[21] Amendment 19, 9 F.R. 7339; Amendment 23, 9 F.R. 9719; Amendment 24, 9 F.R. 10258; Amendment 26, 9 F.R. 11537.
[22] Amendment 32, 9 F.R. 12590.
[23] 9 F.R. 12589.
[24] Hearings on H.R. 4376, 78th Cong., 2d Sess., Vol. 2, pp. 1579-1608.
[25] Hearings on H.R. 4376, 78th Cong., 2d Sess., Vol. 2, p. 1603.