173 So. 254

## CITY OF MOBILE v. ROUSE.
### I Div. 267.

Court of Appeals of Alabama.
Jan. 12, 1937.

Rehearing Denied Feb. 2, 1937.

Outlaw & Seale and V. R. Jansen, all of Mobile, for appellant.

D. R. Coley, Jr., of Mobile, for appellee.

346

BRICKEN, Presiding Judge.

The case is well stated in the very able briefs filed by counsel for the appellant, and is substantially as follows: This is an appeal by the City of Mobile from a ruling of the circuit court of Mobile County, holding an ordinance of the City of Mobile unconstitutional. These proceedings began with the arrest of the appellee, Pat Rouse, in the recorder's court of the City of Mobile, on a charge contained in a warrant dated October 24, 1935, for violating an ordinance adopted October 15, 1935, which reads in part as follows:

"Be it ordained by the City Commission of the City of Mobile

"Section 1. The owner, manager, or operator of, and every barber employed or working in, any barber shop, college, or school, or other establishment where barber services are furnished or offered to the public, shall observe and comply with each of the following rules and regulations in operating or working in any such place:

"1. Every such shop or place shall be well lighted, well ventilated, and kept in a clean, orderly, and sanitary condition.

"2. No barber establishment shall be maintained in a home or in connection with a business where food is handled unless a separate room is provided for the barber work. Every such shop in a residence shall maintain a separate entrance which shall not be opened off from any living quarters of the house or any part of the house other than the entrance to the building.

"3. Candy, cigars, etc., in the barber shop must be kept in an enclosed case or in a sealed package. Beverages must be served from the bottle only.

"4. Every shop shall be supplied with an adequate supply of both hot and cold running water which must be connected with the city system. If city water system is not available, then a tank or gravity pressure container must be used.

"5. If the city sewage system is available it must be used. If not, a drainage system leading from the building must be installed.

"6. Combs and brushes must be cleaned, then immersed in a one to one thousand solution of bichloride of mercury or some equally efficient disinfectant after used upon a patron.

"7. Razors, scissor-blades, tweezers, needles, and other instruments and appliances (except clippers) shall be thoroughly cleansed and then disinfected by immersion in disinfecting solution before being used on each customer.

"8. There must be a disinfecting container for each chair, and it must be kept well filled at all times with disinfectant.

"9. Clippers shall be kept clean at all times.

"10. A shaving mug and its soap and the shaving brush shall be thoroughly rinsed with hot water before each patron is served.

"11. All cups, bowls, basins and strops shall be kept clean at all times.

"12. Hair on neck dusters shall be washed with soap and hot water and dipped in a disinfectant solution at least once each week and shall be kept clean at all times. No common powder puff or sponge shall be used.

"13. Every barber shall wash his hands with soap and fresh water immediately before serving each customer, and again immediately after serving a customer.

"14. The head-rest of every barber chair shall be protected with fresh, clean

paper or cloth before its use for any person.

"15. A clean, freshly-laundered towel must be used for each patron, and includes the dry, or steam towel, and also washcloths.

"16. Whenever a hair-cloth is used as in cutting the hair, shampooing, etc., a newly-laundered towel or other protection shall be placed around the neck so as to prevent the hair-cloth from touching the patron's skin.

"17. All soiled towels, washclothes, neck protectors, etc., must be discarded immediately after being used on a customer.

"18. Dipping towels, shaving mugs, etc., into water containers is prohibited.

"19. Alum or other material used to stop the flow of blood shall be used in liquid form or powder form only. The use of the common styptic pencil or alum lump is prohibited.

"20. No barber shall perform barbering service who knows he has or is known to have a communicable or disease which is infectious.

"21. A customer with definite or obvious open sores such as may occur in barber's itch, erysipelas, syphilis, etc., must not be served in a public barber shop. If the barber touches or handles a customer with any eruption or whose skin is broken out or is inflamed or contains pus, the following precautions shall be immediately observed.

"a. Any shaving mug and brush used must be cleansed with hot water, and immersed for at least ten minutes in an effective disinfectant solution.

"b. The instruments used shall be cleansed and be disinfected by being left in boiling water or in a ten per cent solution of commercial (40%) formalin or by the use of an equally efficient disinfectant for at least ten minutes.

"c. The barber must wash his hands with soap and water followed by a rinsing in a one to one thousand solution of bichloride of mercury or some equally efficient disinfectant.

"Section 2. The following are the minimum prices which may be charged for the rendering of the barber services hereinafter named, either singly or in combination, when such services have been rendered by a practitioner of barbering licensed in this state:

"Hair cut.....Children Twenty-Five Cents
Hair cut............Adults Thirty Cents
Shave ....................Twenty Cents
Shampoo ..............Thirty-five Cents
Facial Massage.........Thirty-five Cents
Tonic ....................Twenty Cents
Singe ....:............Twenty-five Cents
Facial Steam..........Twenty-five Cents
Fitch Shampoo..............Fifty Cents

"The foregoing prices shall not be reduced either directly or indirectly by any means or method whatsoever, or by the giving of coupons, rebates, premiums, prizes, or other things of value.

"Except that the foregoing services may be furnished in a barber college or school at such lesser charges as may be fixed by the manager or operator thereof, when such services are rendered solely in connection with the bona fide instructions."

An appeal was taken from the conviction, and in the circuit court, demurrers were filed to the complaint on January 7, 1936, and again on April 14, 1936. These demurrers attack the constitutionality of the ordinance and also the constitutionality of the act of the Legislature under which ordinance was adopted. Said act is as follows (Gen.Acts 1935, p. 746):

"Be it Enacted by the Legislature of Alabama:

"Section 1. A state and national emergency productive of widespread un-employment and disorganization of trade which burdens commerce and affects the public welfare, is hereby declared to exist, causing an emergency which injuriously affects the morale and standard of living and threatens to affect the industrial peace and safety and health of the people of the State of Alabama.

"Among the trade particularly affected of those which services are rendered upon a person or persons or their clothing or apparels without necessarily involving the sale of merchandise. In such trades there is ruinous price-cutting, widespread unemployment and economic distress, and for the purpose of ameliorating such conditions, it is necessary and desirable to authorize the adoption of ordinances providing for fair competition applicable to such trades in various cities and towns of this state, as provided by this Act.

"Section 2. This Act applies only to those trades where personal services are rendered

upon a person or persons or their clothing or apparels without the sale of merchandise as such, which are herein referred to as service trade. The fact that title to personal property may pass as an incident to rendering such service or services, does not prevent the trade in which this happens from being a service trade provided however that no provision of this Act shall apply to any trade school.

"Section 3. In all cities of this State whose population is not less than 60,000 nor more than 250,000 according to the last or any subsequent Federal Census, the owners, operators, or managers of not less than 60 per cent of the business establishment in any such service trade in any such city or town may apply to the governing body of such city or town for the enactment of an ordinance providing for fair competition for such trade within such city or town. The councils or city commission or like governing body of such cities and towns shall have jurisdiction within such cities and towns to carry out within their respective jurisdiction the provisions of this Act.

"Section 4. The violation of any provision of any ordinance adopted under the provision of this act shall constitute a misdemeanor. Each and every day's continuance of such violation shall constitute a separate offense, and each offense is punishable by a fine of not more than one hundred dollars or imprisonment for not more than thirty days.

"Section 5. The application for an ordinance providing for fair competition shall state the number of business establishments in such city or town engaged in the trade petitioning for such ordinance, and signature of only one person respectively signing on behalf of a business establishment, shall be counted in determining the percentage of establishment making application. The application shall set forth the provision of the requested ordinance. Such ordinance may contain any other fair trade practice provisions which are not unlawful.

"Section 6. At any meeting after receiving such application, the governing body of such city or town may reject or approve, in whole or in part, the application for such ordinance. The rejection of any application shall not prejudice the filing of a new application. The governing body of such city or town, may enact in whole or in part, the provisions of such ordinance, and thereafter such adopted ordinance shall regulate as to matters contained therein the conduct of every person engaged in such service trade within its jurisdiction. The governing body of such city or town may repeal in whole or in part, such ordinance as provided for in this Section.

"Section 7. If any section, sentence, clause or part of this Act is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining portion of this Act.

"Section 8. This Act is hereby declared to be an emergency measure necessary for the immediate preservation of public health, peace, safety and economic security within the state.

"Section 9. All laws or parts of laws in conflict herewith be and the same are hereby repealed.

"Section 10. This Act shall become effective immediately upon its approval by the Governor or its becoming a Law."

The demurrers as contained in the transcript, and as argued in the lower court, attack the city ordinance as violative of the Fifth and Fourteenth Amendments to the Constitution of the United States, section 1, article 1, section 35, article 1, section 36, article 1 and section 103 of the Constitution of the state of Alabama, and the Act of the Legislature here involved is attacked as violative of section 106 of the Constitution of Alabama, and on the further ground that it is a delegation of authority to the City of Mobile, which is unauthorized by the Constitution.

The few facts necessary to the determination of this case are: Pat Rouse, appellee, is a proprietor or operator of a barber shop within the corporate limits of the City of Mobile. On the passage of this ordinance by the city commission, he refused to comply with the provisions of the ordinance, and was brought to trial in the recorder's court and convicted for advertising, charging, and accepting prices for hair cuts and shaves under the minimum price fixed by the schedule contained in the city ordinance.

The contention of the appellant is that the "Sanderson" Act of the Legislature is constitutional in all respects and the ordinance passed by the city commission is a lawful regulation which the city had a right to adopt.

Thus we have for consideration the validity of an ordinance that in effect: (1) Circumscribes the privileges of one group of citizens in one city in one county in Alabama; (2) confers a measure of protection

on one group of citizens in one city in one county in Alabama that is not enjoyed by other members of the group in this state, and that is not shared or enjoyed by other citizens in that county; (3) excludes bartering; (4) excludes free work; (5) requires the barber who can afford to work for less than the minimum price prescribed, to charge a sum that will keep less competent competitors going.

The city undertakes to support the ordinance in several ways: (1) It is claimed that the occupation or trade of barber is a business affected with a public interest and is subject to regulation under the police power; (2) that when the depression causing widespread unemployment and shifting of occupations, made necessary emergency legislation for the relief of those in distress, the lawmakers had their attention drawn to the condition of the barber trade; that they ascertained that the comparative unenforcement of health regulations made it safe for the unemployed to operate, with the most unsanitary equipment and dirty shops and secure customers by reducing prices. The Sanderson Act, it is claimed, was the legislative answer to that situation. (3) It is also claimed that it is within the power of the state government to see that its citizens do not become public charges and to see that no industry or occupation affected with a public interest is allowed by the forces of economic circumstances to beggar those dependent on these trades for their livelihood. (4) It is further claimed that the state has the power to insure compliance with reasonable health regulations by preventing the prima facie violation of these regulations, by doing work at a price which will not bring to a barber sufficient sum to permit his compliance with these sanitary regulations. It is asserted that a minimum price in a city ordinance containing health regulations is a written guarantee to the public that sanitary protection can and will be maintained by the barbers of the city.

█ Let us examine the first proposition. Is the occupation or trade of barber a business affected with a public interest to the extent that the rates and charges for the service rendered may be fixed by law?

The theory on which the rates of a public utility may be regulated is (1) the service it renders is indispensable to the public; (2) the business is monopolistic in character, which deprives the public of the protection afforded by the law of competition; (3) protection against excessive charges is necessary to prevent legalized robbery of the public and provide for earning a fair return is a necessity in order to induce the capital and labor to engage in the venture of rendering the service; (4) the utility operates under a franchise from the public and the property is devoted to public use. On no other theory that we are familiar with can the rates and charges of a public utility be regulated.

Are these reasons applicable to the occupation or trade of barber? However ancient and honorable that occupation or trade may be, we feel safe in saying that it is not indispensable to the public. It is a convenience like many other conveniences that we enjoy. We have become so accustomed to conveniences that we are liable to classify them as necessities. We do not feel, however, justified in holding that the services of a barber are indispensable, in the sense that water and lights and transportation and power and facilities for communication are indispensable in the age in which we live. Neither can it be said that any element of monopoly is present in the occupation or trade of barber. No regulation has been called to our attention in which it is proposed to limit the number of shops or the number of operators in the shops. A public utility is required by law to render certain service, but a barber, although he be licensed under the law of the state, is not legally obligated, and cannot be required to render any service. He may close his shop; or leave his chair for purposes of business or pleasure, or just because it suits him to do so, whenever he sees fit, without in any way being answerable or subject to mandamus for such conduct. A utility, on the other hand, may not cease supplying service without incurring the possibility of a forfeiture of its franchise. It may be required by an appropriate writ to supply service to a customer. The economic law, the law of supply and demand, the law of competition protects the public against unreasonable charges by a barber, and the reason for statutory regulation and protection that is ever present where a utility enjoys a monopoly is wholly and totally absent in the case at bar. Likewise, we do not think we would be justified in holding that the statutory provision for earning a fair return on the capital invested in a barber's business was necessary to induce capital and labor to engage in the occupation or trade of barber.

The Sanderson Act would seem to negative that idea. We might infer from that

act that the trade is overcrowded instead of there being a scarcity of those willing to engage in it.

We have indulged in these observations for the purpose of differentiating the trade of barber from the business of a public utility, and for the purpose of showing that the trade is not affected with a public interest in the sense that justifies regulation of charges made for the service rendered, as is the case of a public utility. We, of course, recognize that the trade is subject to regulation under the police power in the interest of public health, but whether a minimum charge has any real and substantial relation to public health is another matter.

If minimum prices may be fixed by law for cutting hair, what is there to prevent the lawmaker fixing a price for the services of a physician; a class of service of far greater importance to society than the services of a barber? And if the Legislature may fix the minimum price for the services of a physician, it would seem to follow that it might provide that we must pay in advance in order to insure the maximum economic benefit to the physician, and to the public, or die without the benefit of the profession, if we are unable to do so. If minimum prices can be fixed by law for the service rendered by a barber, why would not the same rule apply to a lawyer, a bookkeeper, or a farm laborer, without whose labor we could not eat, a beautician, a mechanic, or any one else engaged in working for a living? And if that is permissible and necessary to the public welfare, would it not likewise be possible for the Legislature to fix a maximum price for the same service, if it deemed the public welfare required such action?

It may be suggested that the Legislature may do both. If so, we can see no escape from a holding that the individual in such trade or occupation or business may be limited by law, instead of by his talent, aspirations, qualifications, character, and opportunities, as to the amount he may earn or sell his labor for, and until human nature changes or ceases to be as it is, it would be more natural to assume that the brackets would be more favorable to the group that exerts the greatest pressure on the lawmakers and most unfavorable to those who exert the least or no pressure at all.

Is it possible for a situation like that to exist under our State and National Constitutions as they are now written? Have our lawmakers the authority to say that we cannot work for less and we shall not charge more? Have they the power to yoke together the skilled and the unskilled, the honest and the dishonest, the sober and the drunk, the loyal and the disloyal, the competent and the incompetent, the slow and the fast, the dullard and the genius, and to tell them all that they must live and work and have their being in the brackets fixed by the Legislature? If so, what becomes of the incentive to acquire skill, learning, character and like intangibles that are the nation's greatest assets? If by legislative power, it is competent to say that less than, and not more than, shall be charged for services, what protection have the great throng who pay for that service, against legislative mistake, or what is worse, arbitrary exercise and abuse of legislative power?

It is idle to suggest that the court may review the reasonableness of either one or both of the legislative brackets. What standard of yardstick is available to the court if the lower and upper limits are in legislative discretion, or even in the legislative domain? Would not the court, in such circumstances, be impelled to the impossible task of considering the minimum and maximum charge for each individual service and the relation of those charges to entire economic status before it could even approach an intelligent conclusion as to the reasonableness of any given bracket for any particular service?

These are practical considerations that suggest themselves to the judicial mind. There seems to be an idea that the old maxim, "Sic utere tuo ut alienum non laedas" literally translated, "so use your own property as not to injure that of another person," but by more proper interpretation, "so as not to injure the rights of another," (Broom's Legal Maxims [7th Ed.] 281) has some kind of application to a case of this kind, or in some measure supports or justifies the action taken. The argument is that a man must not be permitted to sell his labor for so little as that he will injure others by lowering the aggregate income of the group engaged in that particular business, which in turn, it is suggested, lowers the standard of living of all engaged therein; that he must not be permitted to sell his labor for so little as that he will likely become a public

charge or a burden on the public treasury in his old age. As to the last suggestion, the influence that income has an old age status is highly speculative. Experience teaches us that what we save is more important, as a general rule, than what we earn, when it comes to providing against the requirements of old age. The supposition that a minimum charge for services has even a tendency to relieve against the possibility of becoming a public charge is so fanciful and imaginary as to be utterly lacking in substance.

The court cannot base its decision as to the validity of a statute on things dreams are made of. The social security argument advanced to support the ordinance under consideration at the hands of lawmakers, and the social security laws, including old age pensions, are designed to obviate any necessity of one becoming a public charge in the future. We recur then to the suggestion that one member of society should not be permitted to lower the level of living of all engaged in like business, below a certain limit, and that that limit can and should be defined by the Legislature and established by law. We apprehend that none would gainsay the right of a citizen to work free. In time of war our $1 a year men were invaluable. In time of peace it is difficult to conceive of any person in any line of business who does not render some substantial amount of service gratis. Every gratuitous service has the same tendency to lower the general level of living of all engaged in performing that kind of service. Is all gratuitous service to be prohibited for that reason? Have our lawmakers the power to say that we cannot shave a friend without pay, or screw a bolt on a neighbor's car without compensation, because by so doing we diminish the aggregate income of the barber group or the machinist's group, and in that way lower the level of living of all the members of those groups? It seems that if the Legislature can say we cannot work for less, that it might likewise say that we cannot work free if we so desire; neither can we exchange our labor for commodities that are satisfactory to us. If the lawmakers possess such power, then we are no longer free men, but creatures of the state.

 There is another serious objection to the ordinance. It discriminates against the barber in favor of others, and it discriminates against others in favor of the barber. Of all the people in Alabama who must live by a sale of their labor and are dependent upon the sale of service for their daily bread, such as professional men, seafaring men, artisans, and others too numerous to catalog, including women in every line of business, only barbers in Mobile are denied the right to charge what they please for their services. If the measure be deemed a measure designed to protect the occupation or trade of barber, we must know that there are thousands in Mobile and in Alabama, many of whom need protection as much if not more than the barber trade, yet only the barbers are protected against selling their labor for an inadequate amount. Is this equal protection under the law? Can the state constitutionally say that the butcher, the baker and the candlestick maker may set their own price for services they perform; that they may work free, or in exchange for a commodity that is satisfactory to them, but that the barber in Mobile shall not exercise or enjoy that privilege that is exercised and enjoyed by all others?

 Is not the same "cut-throat" competition present in other fields of enterprise? Is competition of that kind confined exclusively to the barber shops in Mobile? If the ordinance is designed to protect the barber, whence comes the authority to protect him to any greater extent than any other seller of service? By what authority can the Legislature make the barber alone the special beneficiary of a legislative will? The law, like the dew, must rest on all alike, the just and the unjust. Singling out an individual or a group of individuals to specially protect or specially punish by law, to the exclusion of all others, is abhorrent to the conception of equal justice to all men, that is the mud sill of the United States of America. The equal protection clause means that the rights of all persons rests upon the same rule under similar circumstances.

"In the case of Sunday Lake Iron Co. v. Wakefield Tp., 247 U.S. 350, 352, 353, 38 S.Ct. 495, 62 L.Ed. 1154 [1156], this court said: 'The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" Sioux City Bridge Company v. Dakota County, 260 U.S. 441,

352

43 S.Ct. 190, 191, 67 L.Ed. 340, 28 A.L.R. 979.

It is difficult to understand how the lawmakers, under the Constitution as it is now written, may fix a minimum price for some service, to the exclusion of all others, without providing the machinery for fixing a minimum price for all services that the citizens of this state are engaged in performing.

We are reminded that the ordinance is not designed to circumscribe or deny the privileges of the barber, or to unduly protect him and leave others unprotected, but that the paramount idea of the lawmakers was to benefit the public. To protect the public health. If the ordinance is judged by its effect, we must come to the conclusion that it circumscribes the privileges of the barber as under it he has less privileges than other citizens, and that in a measure it protects him to the exclusion of all the others. If that be true, we then face the question of whether the lawmakers may protect the public health in that way.

■ There are some methods of protecting the public that are not available to the Legislature under the State and National Constitutions as they are now written. The State Constitution is a restraint upon legislative action. Congress must find its authority in the National Constitution, which is also a restraint on state legislative action in fields that are committed to Congress. There are some avenues that are not open to the supposed advancement of human welfare under our Constitution. We cannot sanction the idea that any actual or supposed public benefit will result to health from a mixture of denied privileges to some and omitted provision for others, or that such scheme has any real or substantial relation to the object sought to be obtained. The taxing power may be resorted to to melt down large holdings and huge incomes, but the police power is not available to raise the income of only one group of sellers of service in one city, in one county of a sovereign state, under the guise of protecting the public health, where the service is not absolutely indispensable to the public welfare. The guardians of the Constitution, the judiciary, must at all times be mindful of the fact that a strong and commendable public desire to improve public conditions is not enough to warrant achieving the desire by a shorter cut than

the constitutional way of paying for the change.

As we understand the question before the court, it has been set at rest by decisions of the Supreme Court of the United States of America. In Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 401, 67 L.Ed. 785, 24 A.L.R. 1238, that tribunal struck down, as unconstitutional, a minimum wage act of the District of Columbia providing for the fixing of minimum wages for women and children in the District. After an exhaustive review of authorities and a repudiation of the suggestion that women of mature age, sui juris, require or may be subjected to restrictions upon their liberty of contract which could not lawfully be imposed in the case of men under similar circumstances, the court said:

"The law takes account of the necessities of only one party to the contract. It ignores the necessities of the employer by compelling him to pay not less than a certain sum, not only whether the employee is capable of earning it, but irrespective of the ability of his business to sustain the burden, generously leaving him, of course, the privilege of abandoning his business as an alternative for going on at a loss. Within the limits of the minimum sum, he is precluded, under penalty of fine and imprisonment, from adjusting compensation to the differing merits of his employees. It compels him to pay at least the sum fixed in any event, because the employee needs it, but requires no service of equivalent value from the employee. It therefore undertakes to solve but one-half of the problem. The other half is the establishment of a corresponding standard of efficiency, and this forms no part of the policy of the legislation, although in practice the former half without the latter must lead to ultimate failure, in accordance with the inexorable law that no one can continue indefinitely to take out more than he puts in without ultimately exhausting the supply. The law is not confined to the great and powerful employers but embraces those whose bargaining power may be as weak as that of the employee. It takes no account of periods of stress and business depression, of crippling losses, which may leave the employer himself without adequate means of livelihood. To the extent that the sum fixed exceeds the fair value of the services rendered, it amounts to a compulsory exaction from

the employer·for the support of a partially' indigent person, for whose condition there rests· upon him no peculiar responsibility, and therefore, in effect, arbitrarily shifts to his shoulders a burden which, if it belongs to anybody belongs to society as a whole.

"The feature of this statute, which perhaps more than any other, puts upon it the stamp of invalidity, is that it exacts from the employer an arbitrary payment for a purpose and upon a basis having no causal connection with his business, or the contract or the work the employee engages to do."

The ordinance under consideration is subject to similar criticism. It ignores the necessity of the customer by compelling him to pay not less than a certain sum; it compels him to pay at least the sum fixed in any event, because the lawmakers said the barber needs it, but it requires no service of equivalent value from the barber. It, therefore, undertakes to solve but one-half of the problem.

Further on in the opinion the court took cognizance of what we have attempted to point out above, and that is, the power to fix a maximum charge for the service rendered as well as to change the minimum charge and reduce it to a much smaller amount. On page 560 of 261 U.S., page 402 of 43 S.Ct., 67 L.Ed. 785, 24 A.L.R. 1238, supra, the court pointed out: "Finally, it may be said that if, in the interest of the public welfare, the police power may be invoked to justify the fixing of a minimum wage, it may, when the public welfare is thought to require it, be invoked to justify a maximum wage. The power to fix high wages connotes, by like course of reasoning, the power to fix low wages If, in the face of the guaranties of the Fifth Amendment, this form of legislation shall be legally justified, the field for the operation of the police power will have been widened to a great and dangerous degree. If, for example, in the opinion of future lawmakers, wages in the building trades shall become so high as to preclude people of ordinary means from building and owning homes, an authority which sustains the minimum wage will be invoked to support a maximum wage for building laborers and artisans, and the same argument which has been here urged to strip the employer of his constitutional liberty of contract in one direction will be utilized to strip the employee of his constitutional liberty of contract in the opposite direction.

A wrong decision does not end with itself; it is a precedent, and, with the swing of sentiment, its bad influence may run from one extremity of the arc to the other."

At a later day, in Wolff Packing Company v. Court of Industrial Relations, 262 U.S. 522, 43 S.Ct. 630, 632, 67 L.Ed. 1103, 27 A.L.R. 1280, the Industrial Commission Act of the state of Kansas, that authorized the court to fix a minimum wage if employer and employee could not agree, was before the court. As stated by Chief Justice Taft, the effect of the act was as follows: "The necessary postulate of the Industrial Court Act is that the state, representing the people, is so much interested in their peace, health, and comfort that it may compel those engaged in the manufacture of food and clothing, and the production of fuel, whether owners or workers, to continue in their business and employment on terms fixed by an agency of the state, if they cannot agree. Under the construction adopted by the state Supreme Court the act gives the industrial court authority to permit the owner or employer to go out of the business, if he shows that he can only continue on the terms fixed at such heavy loss that collapse will follow; but this privilege under the circumstances is generally illusory. Block v. Hirsh, 256 U.S. 135, 157, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165. A laborer dissatisfied with his wages is permitted to quit, but he may not agree with his fellows to quit or combine with others to induce them to quit."

After a review of the authorities in which the question of authority to fix a minimum wage is referred to, the Chief Justice said:

"It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator, or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by state regulation. It is true that in the days of the early common law an omnipotent parliament did regulate prices and wages as it chose, and occasionally a colonial legislature sought to exercise the same power; but nowadays one does not devote one's property or business to the public use or clothe it with a public interest merely because one makes commodities for, and sells to,

the public in the common callings of which those above mentioned are instances.

"An ordinary producer, manufacturer, or shopkeeper may sell or not sell as he likes, United States v. Trans-Missouri Freight Association, 166 U.S. 290, 320, 17 S.Ct. 540, 41 L.Ed. 1007; Terminal Taxicab Co. v. District of Columbia, 241 U.S. 252, 256, 36 S.Ct. 583, 60 L.Ed. 984, Ann.Cas. 1916D, 765, and while this feature does not necessarily exclude businesses from the class clothed with a public interest, German Alliance Insurance Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189, it usually distinguishes private from quasi-public occupations.

"In nearly all the businesses included under the third head above, the thing which gave the public interest was the indispensable nature of the service and the exorbitant charges and arbitrary control to which the public might be subjected without regulation."

See, also, People v. Osborne (Cal. Super.) 59 P.(2d) 1083, a direct authority on the questions here involved.

In Williams v. Standard Oil Co., 278 U. S. 235, 49 S.Ct. 115, 73 L.Ed. 287, 60 A. L.R. 596, the Supreme Court of the United States denied the power of the state of Tennessee to prescribe prices at which gasoline might be sold.

In New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 374, 76 L.Ed. 747, the same court ruled that the state of Oklahoma could not control the business of manufacturing and selling ice, saying: "It is a business as essentially private in its nature as the business of the grocer, the dairyman, the butcher, the baker, the shoemaker, or the tailor. * * * And this court has definitely said that the production or sale of food or clothing cannot be subjected to legislative regulation on the basis of a public use."

To like effect is Fairmont Creamery Co. v. Minnesota, 274 U.S. 1, 47 S.Ct. 506, 71 L.Ed. 893, 52 A.L.R. 163.

In the brief filed by appellant we are referred to the milk cases—Franklin v. State ex rel. Alabama State Milk Control Board, 232 Ala. 637, 169 So. 295, and Nebbia v. People of the State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, Borden's Farm Products Co. v. Ten Eyck, 297 U.S. 251, 56 S.Ct. 453, 80 L.Ed. 669, and St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033. We have considered those with care. As we understand them, they are not in conflict with the authorities above referred to. The ruling in the milk cases is predicated upon three propositions that are not present in the case before the court. Those propositions are: (a) Milk is essential; (b) its production and distribution is a paramount industry of the state; (c) the fluid milk industry is affected by factors of instability peculiar to itself which calls for special methods of control.

The opinion here prevails that the trade or occupation of barber is desirable but not essential: it is not a paramount industry of the state; it is not affected by factors of instability which calls for special methods of control. For that reason we hold the authorities referred to inapplicable to the case at bar.

Finally, it is urged that the city's position is supported by State ex rel. Fulton v. Ives, 123 Fla. 401, 167 So. 394, 403, that involved a regulation of the Florida Barber Board purporting to fix a minimum price for barber work. Presiding Judge Ellis, Chief Justice Whitfield, and Justice Davis concurred in a very able opinion prepared by the Presiding Justice, holding the regulation unconstitutional. Justice Brown concurred in the result on grounds different from those stated by the Justices last named. Justice Buford dissented and Justice Terrell concurred in the conclusion by Justice Buford.

The two opinions say about everything that it is necessary to say on the subject. This court accepts the opinion of Presiding Judge Ellis as sound, and we quote with approval from the concluding paragraph of that opinion as follows:

"Reduced to its last analysis, the thought underlying the act seems to be not that the barber trade is a paramount industry affecting the general welfare, but that the prosperity of the barber class sufficient to maintain the average barber and his family 'properly' is a sufficient reason for the exercise by the state of the power of direction, control, and management of the barber business in the interest of health and morals. And, further, that the liberty of contract enjoyed by every barber engaged in his vocation is used by him or likely to be so used by him as to imperil the business and jeopardize the public health, morals, and general welfare.

"We find in none of the cases support, directly or indirectly, of such a notion of democratic government or constitutional liberty."

The courts are the final judges as to what are proper subjects of the police power, and the lawmaking power cannot arbitrarily make that a subject of its exercise which from its nature is not one.

We are unwilling to say that the attempted deprivation of the liberty of contract in this ordinance bears any substantial relation to the preservation of the public health. If the lawmakers have the power to fix 25 cents as a minimum price for cutting hair, the same power would enable them to say that 10 cents shall constitute a maximum price for the same service. It is our judgment that even the depression, with its deplorable consequences and devastating effect upon the lives and property of our citizens, does not justify an abandonment, surrender, or impairment of the principles we have attempted to discuss.

For the reasons stated, we are of the opinion that the order of the court below, adjudging the ordinance in question invalid, was correct.

The judgment appealed from is affirmed.

Affirmed.

RICE, Judge (dissenting).

I find I must dissent from the holding of the majority in this court.

My views will be found expressed in an opinion filed in the companion case of City of Mobile v. A. E. Gibson, ante, p. 343, 173 So. 264.