**GREAT ATLANTIC & PACIFIC TEA CO. v. ERVIN, Atty. Gen., et al.**

No. 2981.

District Court, D. Minnesota, Fourth Division.

April 29, 1938.

Bergmann Richards, of Minneapolis, Minn., and George J. Feldman, of Washington, D. C., for plaintiff.

William S. Ervin, Atty. Gen., Matthias N. Orfield, Deputy Asst. Atty. Gen., Joseph H. Sceger, Sp. Asst. Atty. Gen., and Michael F. Kinkead, Co. Atty., and Richard B. Ryan, Asst. Co. Atty., both of St. Paul, Minn., for defendants Ervin, Kinkead, and Gibbons.

Edward J. Goff, Co. Atty., and William G. Compton, Asst. Co. Atty., both of Minneapolis, Minn., for defendants Goff and Wall.

Ben W. Palmer, of Minneapolis, Minn., for Minnesota Council of Retail Trade Ass'ns, amicus curiæ.

Before SANBORN, Circuit Judge, and NORDBYE and JOYCE, District Judges.

## PER CURIAM.

Upon the hearing it was stipulated by the parties in open court that the entire case should be deemed submitted to the court for final determination upon the pleadings, the affidavits filed by the respective parties, the oral arguments, and the briefs.

The statute the validity of which is challenged is known as the Minnesota Unfair Trade Practices Act, and is entitled, "An act to prohibit unlawful discrimination in the production, manufacture or distribution of certain commodities, articles, goods, wares and merchandise in trade and to prohibit unfair competitive trade practices, providing for injunctive relief and damages, defining the duties of county attorneys and the attorney general, providing penalties for violations, and repealing Laws of 1921, Chapter 413, being Sections 10464–7, inclusive, of Mason's Minnesota Statutes of 1927." It was passed by the Legislature of the state of Minnesota at its regular session in 1937, as chapter 116, Laws of Minnesota 1937. Chapter 456 was passed at the same session to correct a typographical error in section 3 of part 2 of chapter 116. The full text of the statute, as amended, will be found in the footnote.[1]

---

1 "Be it enacted by the Legislature of the State of Minnesota:

"PART ONE

"Section 1. Application of Act.—The following sections of this act, constituting Part One thereof shall apply only to the manufacture, production or distribution of any commodity, article, goods, wares or merchandise in general use or consumption.

"Sec. 2. Discrimination unlawful.— Any person, partnership, firm or corporation, foreign or domestic, doing business in the State of Minnesota, and engaged in the production, manufacture, distribution of any printed or mimeograph matter, commodity, article, goods, wares or merchandise in general use or consumption, that intentionally, for the purpose of destroying the competition of any regular established dealer in such commodity, article, goods, wares or merchandise, or to prevent the competition of any person, firm or corporation who or which, in good faith, intends and attempts to become such dealer, shall discriminate between different sections, communities or cities of this state by selling or furnishing such commodity, article, goods, wares or merchandise at a lower price or rate in one section, community or city or any portion thereof, than such person, firm or corporation, foreign or

domestic, charges for such commodity, article, goods, wares or merchandise in another section, community or city, or any portion thereof, after making allowance for difference, if any, in the grade, quality or quantity after equalizing the distance from the point of production, manufacture or distribution and freight rates therefrom, shall be guilty of unfair discrimination, provided that this act shall not prevent any person, firm or corporation from in good faith, meeting local competition within any one section, community, village or city. The inhibition hereof against locality discrimination shall embrace any scheme of special rebates, collateral contracts or any device of any nature whereby such discrimination is, in substance or fact, effected in violation of the spirit and intent of this act, together with all amendments thereof.

"Sec. 3. Law repealed.—Chapter 413 of the Laws of 1921, being Sections 10464–7, inclusive, of Mason's Minnesota Statutes, 1927, are hereby repealed.

"PART TWO

"Section 1. Application of Act.—The following sections of this act constituting Part Two thereof shall apply only to the selling, offering or advertising for sale, giving away or offering or advertising the intent to give away of any com-

modity, article, goods, wares or merchandise, in wholesale or retail trade.

"Sec. 2. Certain acts to be unfair discrimination.—Any person, partnership, firm or corporation, engaged in business within this state, which sells, offers for sale or advertises for sale any commodity, article, goods, wares or merchandise at less than the cost thereof to such vendor, or gives, offers to give or advertises the intent to give away any commodity, article, goods, wares or merchandise for the purpose of injuring competitors and destroying competition, shall be guilty of unfair discrimination, and upon conviction provided herein shall be subject to the penalties therefor.

"Any person, firm, partnership or corporation which sells goods ·in any part of the State of Minnesota at prices lower than those exacted by said person elsewhere in the State of Minnesota for like quantities and grades and where the effect of such lower prices may be substantially to lessen competition or tend to create a monopoly in any line of business, or to injure, destroy or prevent competition with the person selling at such lower prices, shall be guilty of unfair competition and subject to the penalties of this act; provided that nothing shall prevent differentials in prices in different localities which make only due allowances for differences in costs of delivery for such goods to different localities; nor differences in price made in good faith to meet local competition of any other person in such locality.

"The inhibition against sales below cost or locality discrimination shall embrace any scheme of special rebates, collateral contracts, or any device of any nature whereby such discrimination is, in substance or fact, effected in violation of the spirit and intent of this act, together with all amendments thereto.

"Sec. 3. Definitions.—The term 'retailer' as used herein shall mean any person, partnership, firm, corporation or association, foreign or domestic, selling any commodity, article, goods, wares, or merchandise to the consumer and not for the purpose of resale in any form.

"The term 'wholesaler' as used herein shall mean any person, firm or corporation, partnership, association, business trust, or any unincorporated organization, other than a manufacturer or producer and wholesalers engaged in interstate commerce who are subject to the provisions of the Robinson-Pattman Act, selling or supplying any commodity, article, goods, wares, or merchandise to retailers, industrial buyers, restaurants, institutions or the selling ón the part of one wholesaler to another wholesaler.

"The term 'cost' as applied to the wholesale or retail vendor shall mean: 1. Where a manufacturer publishes a list price, cost shall be the manufacturer's list price less his published discounts plus the cost of doing business by said vendor: 2. On all other merchandise cost shall be the current delivered invoice or replacement cost whichever is lower plus the cost of doing business by said vendor.

"The 'cost of doing business' or 'overhead expense' is defined as the average of all costs of doing business incurred in the conduct of such business during the calendar year immediately preceding any alleged violation of this Act, or in the event that any person, partnership, firm or corporation shall have been engaged in business within the State for a shorter period of time, in that event the average cost for such period immediately preceding any alleged violation of this Act and must include without limitation the following items of expense:

"Labor, including salaries and bonuses of executives and officers, rent, depreciation, selling costs, maintenance of equipment, delivery costs, all types of licenses, taxes, insurance and advertising, and other fixed and incidental expenses.

"Any sale made by the retail vendor at less than 10 per cent above the manufacturer's published list price, less his published discounts, where the manufacturer publishes a list price or in the absence of such a list price, at less than 10 per cent above the current delivered invoice or replacement cost, shall be prima facie evidence of a violation of this act.

"Provided, however, that no prosecution shall be had or any action at law for damages or injunctive relief shall lie where the vendor sells at a price not less than 15 per cent above the manufacturer's published list price, less his published discounts, where the manufacturer publishes a list price or in the absence of such a list price, at less than 15 per cent above the current delivered invoice or replacement cost.

"Sec. 4. Bankrupt sales not to be considered in fixing costs.—In establishing the cost of a given article, goods, wares or merchandise to the vendor, the invoice cost of said article, goods, wares or merchandise purchased at a forced, bankrupt, closeout sale, or other sale outside of the ordinary channels of trade may not be used as a basis for justifying a price lower than one based upon the replacement cost as of date of said sale of said article, goods, wares or merchandise replaced through the ordinary channels of trade, unless said article, goods, wares

or merchandise is kept separate from goods purchased in the ordinary channels of trade and unless said article, goods, wares or merchandise is advertised and sold as merchandise purchased at a forced, bankrupt, closeout sale, or by means other than through the ordinary channels of trade, and said advertising shall state the conditions under which said goods were so purchased, and the quantity of such merchandise to be sold or offered for sale.

"Sec. 5. Cost surveys may be deemed competent evidence.—Where a particular trade or industry, of which the person, partnership, firm or corporation complained against is a member, has an established cost survey for the locality and vicinity in which the offense is committed, the said cost survey shall be deemed competent evidence to be used in proving the costs of the person, firm or corporation complained against within the provisions of this act; and it is further provided that where such cost survey has established a fair and reasonable average cost of doing business for that particular trade or industry, such average cost shall be deemed prima facie evidence of cost of all individuals, firms or corporations of such trade or industry in such locality and vicinity; and sales at prices less than the actual replacement cost of the goods plus such average cost as above described, shall be deemed to be sales below cost, within the provisions of this act.

"Sec. 6. Exceptions.—The provisions of Sections 2-5 inclusive, of Part Two of this act shall not apply to any sale made:

"(a) In closing out in good faith the owner's stock or any part thereof for the purpose of discontinuing his trade in any such stock or commodity, and in case of the sale of seasonal goods or merchandise where style is the paramount feature or to the bona fide sale of perishable goods to prevent loss to the vendor by spoilage or depreciation, provided notice is given to the public thereof.

"(b) When the goods are damaged or deteriorated in quality, and notice is given to the public thereof.

"(c) By an officer acting under the orders of any court.

"(d) In an endeavor made in good faith to meet the local prices of a competitor as herein defined selling the same commodity, articles, goods, wares or merchandise in the same locality or trade area.

## "PART THREE

"Section 1. Penalties for violation of Act.—Any person, firm or corporation, whether as principal, agent, officer, or director for himself, or itself, or for another person, firm or corporation, wilfully violating the provisions of Section 2 of Part One, or Sections 2-5, inclusive, of Part Two of this act, shall, upon conviction thereof, be fined not less than $200.00, nor more than $1,000.00, for each offense, or, in default of the payment of such fine, by imprisonment in the county jail for not less than three months nor more than one year.

"Any person who either as director, officer or agent of any firm or corporation or as agent of any person violating the provisions of Section 2 of Part One, or Sections 2-5, inclusive, of Part Two, assists or aids, directly or indirectly, in such violation shall be responsible therefor equally with the person, firm or corporation for whom or which he acts.

"In the prosecution of any person as officer, director, or agent, it shall be sufficient to allege and prove the unlawful intent of the person, firm or corporation for whom or which he acts.

"Sec. 2. Who may maintain action.—Any aggrieved person, partnership, firm or corporation or trade association, may maintain an action to enjoin a continuance of any act or acts in violation of Section 2 of Part One or Sections 2-5 of Part Two of this act, and, if injured thereby, may recover damages. If in such action the court shall find that the defendant is violating or has violated any of such provisions it shall enjoin the defendant from a continuance thereof. It shall not be necessary that actual damages to the plaintiff be alleged or proved. In addition to such injunctive relief, the plaintiff in such action shall be entitled to recover from the defendant the amount of the actual damages to him, if any. In any injunction proceedings brought against any person as officer, director or agent of any person, firm or corporation, it shall be sufficient to allege and prove the unlawful intent of the person, firm or corporation for whom or which he acts.

"Sec. 3. Remedies cumulative.—Nothing in this act shall be construed as repealing any act other than Chapter 413 of the Laws of 1921, but the remedies herein provided shall be cumulative to all other remedies provided by law.

"Sec. 4. Provisions severable.—The provisions of this act are hereby declared to be severable. If one provision hereof shall be found by the decision of a court of competent jurisdiction to be invalid such decision shall not affect the validity of the other provisions of this act.

"Approved March 30, 1937."

The statute as an entirety is aimed at those who manufacture, produce, and distribute merchandise and commodities within the state of Minnesota. It is divided into three parts. Part 1 seems to relate exclusively to those who are engaged in manufacturing and producing goods. Part 2 relates to those engaged as wholesalers and retailers in the distribution of goods. Part 3 provides means for enforcing provisions of parts 1 and 2. While there is some doubt as to whether parts 1 and 2 do not overlap, since part 1 also relates to the distribution of goods, we shall, for the purposes of this discussion, consider first parts 2 and 3, which are clearly applicable to the plaintiff, which is neither a producer nor a manufacturer but is the owner and operator of a large number of retail grocery stores in many different localities in the state of Minnesota.

The first question to be considered is whether the subject matter of the legislation in question is within the police power of the state.

It is contended by the plaintiff that the business in which it is engaged, and which is sought to be subjected to regulation, is not a business "affected with a public interest" and is not subject to such regulation as the statute provides. The Supreme Court of the United States, in Nebbia v. New York, 291 U.S. 502, at pages 537, 538, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469, has recently said:

"But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells.

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio. 'Whether the free operation of the normal laws of competition is a wise and whole-

some rule for trade and commerce is an economic question which this court need not consider or determine.' Northern Securities Co. v. United States, 193 U.S. 197, 337, 338, 24 S.Ct. 436, 48 L.Ed. 679. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.

"The lawmaking bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public."

The words "affected with a public interest" mean nothing more than "subject to the exercise of the police power." Nebbia v. New York, supra, 291 U.S. 502, at page 533, 54 S.Ct. 505, 514, 78 L.Ed. 940, 89 A.L.R. 1469.

The Fourteenth Amendment to the Constitution of the United States does not prohibit governmental regulation by the

state for the public welfare. It conditions the exertion of the admitted power of the state by insuring that the end shall be accomplished by means which are consistent with due process. The guaranty of due process demands only that the means shall not be unreasonable, arbitrary, or capricious, and that they shall have a real and substantial relation to the object sought to be attained. Nebbia v. New York, supra, 291 U.S. 502, at page 525, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469.

The object sought to be accomplished by the legislation with which we are concerned is the prevention of the sale of goods, wares, and merchandise in the state of Minnesota at prices less than cost, with the intent and purpose on the part of the vendor of injuring his competitors and destroying or lessening competition. That the Legislature of the state of Minnesota might reasonably believe that such sales, made for such a purpose, tend to injuriously affect fair competition and to encourage monopoly and are opposed to the general public welfare and should therefore be curbed, we think is not to be seriously doubted. While we have no reason to believe that there is a dearth of grocers or other merchants in the state of Minnesota or a lack of competition among them or a present threat of monopoly in the grocery business, we are of the opinion that the state of Minnesota was free to adopt the public policy declared by the Legislature in this statute.

We shall concern ourselves only with determining whether the means provided by the statute for the enforcement of the policy adopted are consistent with the requirements of due process, or are unreasonable, arbitrary, capricious, and without a real and substantial relation to the object sought to be attained, and therefore violative of the due process clause or the equal protection clause of the Fourteenth Amendment.

The first paragraph of section 2 of part 2 of the statute provides: "Any person, partnership, firm, or corporation, engaged in business within this state, which sells, offers for sale or advertises for sale any commodity, article, goods, wares or merchandise at less than the cost thereof to such vendor, or gives, offers to give or advertises the intent to give away any commodity, article, goods, wares or merchandise for the purpose of injuring competitors and destroying competition, shall be guilty of unfair discrimination, and upon conviction provided herein shall be subject to the penalties therefor."

It is contended by the plaintiff that the quoted paragraph, because of the absence of a comma after the word "merchandise" where it last appears therein, must be construed to prohibit any sale below cost, regardless of the intent of the vendor. This contention, we think, is without merit. The defendants assert that the plain intent and purpose of the Legislature was to prohibit the sale or the offering for sale of goods at less than their cost "for the purpose of injuring competitors and destroying competition"; and this, it seems to us, is reasonably apparent. Under such circumstances, a court may properly disregard punctuation, or repunctuate, if that be necessary, in order to arrive at the natural meaning of the language used. Hammock v. Loan & Trust Co., 105 U.S. 77, 84, 85, 26 L.Ed. 1111; United States v. Lacher, 134 U.S. 624, 628, 10 S.Ct. 625, 33 L.Ed. 1080; United States v. Oregon & California R. Co., 164 U.S. 526, 541, 17 S.Ct. 165, 41 L.Ed. 541; Stephens v. Cherokee Nation, 174 U.S. 445, 480, 19 S.Ct. 722, 43 L.Ed. 1041; Chicago, M. & St. P. Ry. Co. v. Voelker, 8 Cir., 129 F. 522, 526, 527, 70 L.R.A. 264; United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 82, 83, 53 S.Ct. 42, 43, 44, 77 L.Ed. 175; County of Sibley v. Village of Gibbon, 115 Minn. 56, 59, 131 N.W. 786.

The second paragraph of section 2 of part 2 of the statute provides: "Any person, firm, partnership or corporation which sells goods in any part of the State of Minnesota at prices lower than those exacted by said person elsewhere in the State of Minnesota for like quantities and grades and where the effect of such lower prices may be substantially to lessen competition or tend to create a monopoly in any line of business, or to injure, destroy or prevent competition with the person selling at such lower prices, shall be guilty of unfair competition and subject to the penalties of this act; provided that nothing shall prevent differentials in prices in different localities which make only due allowances for differences in costs of delivery for such goods to different localities; nor differences in price made in good faith to meet local competition of any other person in such locality."

We gather that the purpose of the above paragraph is to prevent an owner of stores

in different localities from unfairly reducing prices at his store in one locality for the purpose of driving out or injuring his competitors in that locality. It is to be noted that the prohibition contained in the paragraph applies regardless of the actual intent of the merchant. The requirement is that at all stores under the same ownership, goods of the same quantity and grade shall be sold at the same price except for differences which can be justified on account of varying costs of delivery or by the necessity of meeting local competition. No differential in price is permitted on account of differences in selling costs at different stores. There is nothing in the statute which implies any intent on the part of the Legislature to penalize the ownership and operation by one individual of more than one store. That such ownership and operation of multiple stores is lawful is recognized by the statute.

The evidence shows, and it is common knowledge, that a store which is run on a cash-and-carry basis can do business at a much lower selling cost than a store run on a credit-and-delivery basis; that selling costs in different cash-and-carry stores also vary, due to a number of factors, such as differences in rents, the amount of service furnished customers, class of customers, volume of trade, efficiency of management, and density of population. The evidence also shows that so-called "super markets" which are well located and furnish a minimum of service and cater to the class of patrons who desire to purchase in considerable quantities at the lowest possible prices, can be run at a much less overhead expense than other cash-and-carry stores. Under the paragraph in question, a merchant who runs a credit-and-delivery store in one section of a city and who also has a cash-and-carry store in another section thereof must ascertain his average selling cost at the two stores for the purpose of determining at what prices it will be lawful for him to sell his goods at either. This prevents him from passing on to the customers of his cash-and-carry store the full benefit of the lower prices which might otherwise result from the lower selling costs at that store, and, if the store is to continue to operate, requires its customers to absorb a portion of the burden of the higher selling costs of the other store. This seems to place such a merchant, with respect to his cash-and-carry store, in an unjustifiably unfavorable position with respect to the competitors of that store. We do not understand that the Legislature may declare a fair competitive practice to be an unfair competitive practice. If differentials in prices may properly be based upon differences in costs of deliveries to different localities, there is no reason, apparent to us, why differences in selling costs should not also furnish a proper basis for price differentials. While the effect of the paragraph in question is to make each store a unit with respect to determining what differences in prices are justified by varying costs of delivery or are necessary to meet local competition, it will be observed that it makes all stores belonging to the same individual or coporation a unit for determining selling prices so far as such prices are dependent upon selling costs.

The defendants refer us to Central Lumber Co. v. State of South Dakota, 226 U.S. 157, 33 S.Ct. 66, 57 L.Ed. 164. In that case the court dealt with a South Dakota statute, Laws 1907, c. 131, § 1, which provided that a vendor who "intentionally, for the purpose of destroying the competition, of any regular, established dealer in such commodity * * * shall discriminate between different sections, communities, or cities of this state, by selling such commodity at a lower rate in one section * * * than such person * * * charges for such commodity in another section, * * * after equalizing the distance from the point of production," shall be guilty of an offense. It will be observed that that statute requires that the state must prove that the vendor "intentionally, for the purpose of destroying the competition * * * shall discriminate." Under that statute, price differentials due solely to differences in overhead expense or sales costs would be legal, for the reason that such differences, being justifiable, would negative any intent on the part of a vendor to vary his prices in order to destroy competition. However, under the paragraph of the Minnesota statute which we are considering, if the sale of an article at a price lower than is justified by differences in delivery costs or by prevailing competition "may be substantially to lessen competition or tend to create a monopoly in any line of business, or to injure, destroy or prevent competition with the person selling at such lower prices," then the vendor is guilty of a gross misdemeanor regardless of the fact that his lower prices may have been fully justified by his lower selling costs in the particular locality.

The case of Fairmont Creamery Co. v. Minnesota, 274 U.S. 1, 47 S.Ct. 506, 508, 71 L.Ed. 893, 52 A.L.R. 163, appears to be determinative of the question of the validity of the paragraph of the statute which we are now considering. There, as here, the statute applied regardless of intent or purpose. The court said (274 U.S. 1, at page 8, 47 S.Ct. 506, 508, 71 L.Ed. 893, 52 A.L.R. 163):

"As the inhibition of the statute applies irrespective of motive, we have an obvious attempt to destroy plaintiff in error's liberty to enter into normal contracts, long regarded, not only as essential to the freedom of trade and commerce, but also as beneficial to the public. Buyers in competitive markets must accommodate their bids to prices offered by others, and the payment of different prices at different places is the ordinary consequence. Enforcement of the statute would amount to fixing the price at which plaintiff in error may buy, since one purchase would establish this for all points, without regard to ordinary trade conditions.

"The real question comes to this: May the state, in order to prevent some strong buyers of cream from doing things which may tend to monopoly, inhibit plaintiff in error from carrying on its business in the usual way heretofore regarded as both moral and beneficial to the public and not shown now to be accompanied by evil results as ordinary incidents? Former decisions here require a negative answer. We think the inhibition of the statute has no reasonable relation to the anticipated evil—high bidding by some with purpose to monopolize or destroy competition. Looking through form to substance, it clearly and unmistakably infringes private rights, whose exercise does not ordinarily produce evil consequences, but the reverse."

Differentials in prices justified by the differences in selling costs at different stores have not heretofore been considered as iniquitous, wrongful, or unfair, nor as having any tendency to destroy competition or to foster monopoly. In fact such price differentials have been regarded as beneficial to the public and not harmful to any one, and, even though they may affect competition, they cannot be considered as the evil which the Legislature was seeking to stamp out. The effect upon competition of differences in prices honestly based on differences in selling costs is the normal and natural result of fair competition between merchants whose overhead expenses differ. This type of competition is to be encouraged in the public interest, rather than restrained.

Reference is also made by the defendants to section 2 of the Clayton Act as originally enacted and as amended, see tit. 15, U.S.C. § 13, 15 U.S.C.A. § 13, but it is to be observed that that legislation recognizes as legitimate, price differentials resulting from differences in selling costs.

We think that the Legislature may not declare honest price variations, based solely upon differences in sales costs at different stores owned by the same merchant, to be illegal, and that to do so is arbitrary and discriminates unfairly between merchants owning one store in one locality and merchants owning more than one store and doing business in more than one locality.

For the reasons stated, we hold that the second paragraph of section 2 of part 2 is unconstitutional.

The third paragraph of section 3 of part 2 provides: "The term 'cost' as applied to the wholesale or retail vendor shall mean: 1. Where a manufacturer publishes a list price, cost shall be the manufacturer's list price less his published discounts plus the cost of doing business by said vendor: 2. On all other merchandise cost shall be the current delivered invoice or replacement cost whichever is lower plus the cost of doing business by said vendor."

Under subdivision 1 of this definition of "cost," a merchant who buys from a manufacturer who publishes a list price must, in determining the prices at which he is required to sell, accept as the actual cost of his goods the prices which are shown by the manufacturer's published list, less published discounts, whether or not they represent the merchant's actual cost. The evidence before us indicates that frequently the published list prices of a manufacturer, less his published discounts, do not represent the prices at which he sells his goods to his customers. This, it appears, is particularly true with respect to manufacturers of commodities the market prices of which are subject to frequent fluctuations. An affidavit of an official of a local canning company contains this statement: "List prices as published by [his] company and other can-

neries in said state [Minnesota] and elsewhere are often not the selling prices obtained by said company or other canneries, but are their asking prices or the point at which bargaining with prospective purchasers begins; that in actual practice the price at which the product or pack of canneries is sold varies as much as from three to ten per cent from published list prices."

Had the Legislature seen fit to define "cost" as "actual cost plus the cost of doing business by said vendor" and to provide that where goods were purchased by a merchant from a manufacturer who had a published list price, such list price less published discounts, in effect at the time the merchant acquired his goods, should be prima facie evidence of their actual cost, an entirely different situation would be presented, since there would seem to be nothing unreasonable in assuming, in the absence of proof to the contrary, that a merchant had purchased at list price less published discounts. To define "cost" as something which may or may not be what a merchant has actually paid in the ordinary course of trade for his goods, it seems to us is arbitrary and discriminatory. To treat a sale of goods which yields to a merchant all that he has actually expended for the goods plus his cost of doing business, as an unfair trade practice merely because the manufacturer has published lists of prices and discounts on the basis of which it appears that the merchant paid more for his goods than he actually did pay, seems unjustifiable. While it may be argued that the Legislature did not intend this definition of "cost" to be exclusive or to prevent a merchant from showing what he actually paid for the goods which he sold, we can only take the legislative intent to be as expressed in the act, and are without power, by construction or otherwise, to amend the plain language which the Legislature has employed.

We hold that the third paragraph of section 3 of part 2 is unconstitutional.

The fourth paragraph of section 3 of part 2 is as follows: "The 'cost of doing business' or 'overhead expense' is defined as the average of all costs of doing business incurred in the conduct of such business during the calendar year immediately preceding any alleged violation of this Act, or in the event that any person, partnership, firm or corporation shall have been engaged in business within the state for a shorter period of time, in that event the average cost for such period immediately preceding any alleged violation of this Act and must include without limitation the following items of expense."

The difficulty with this definition of "cost of doing business" is that it fails to give any effect whatever to a merchant's current selling costs. He may during the year when the alleged violation of the act takes place have greatly reduced his overhead expense; he may have changed from a credit-and-delivery system of merchandising to a cash-and-carry system; he may have made new leases at greatly reduced rentals; he may have cut salaries and reduced the number of his employees; he may have completely revolutionized his business for the very purpose of being able to sell a greater volume of goods at a lower price and with a less profit; and yet, because of this definition of the "cost of doing business," he cannot make the reduction in his prices which is entirely justified by his reduced overhead, because, if he does so, he will violate the law. In fixing his prices he is required to disregard his current overhead and to base his prices upon the overhead of the preceding calendar year. It probably would not have been unreasonable had the statute made the selling costs of the preceding calendar year prima facie evidence of current costs. In the absence of any proof of what current selling costs actually were, there could be little doubt that such costs might reasonably be assumed to be the same as those which prevailed during the preceding calendar year. But where a merchant maintains a system of current cost accounting which actually and honestly reflects his current overhead and selling costs, we think the Legislature may not, reasonably, compel him to base his prices upon his selling costs of the preceding calendar year; and that to require him to do so is arbitrary, discriminatory, and not reasonably related to the avowed purpose of this legislation.

Hence it follows that the fourth paragraph of section 3 of part 2 cannot be sustained.

The sixth paragraph of section 3 of part 2 provides: "Any sale made by the retail vendor at less than 10 per cent above the manufacturer's published list price, less his published discounts, where the manufacturer publishes a list price or in the

absence of such a list price, at less than 10 per cent above the current delivered invoice or replacement cost, shall be prima facie evidence of a violation of this act."

The first three paragraphs of section 1 of part 3 read as follows:

"Any person, firm or corporation, whether as principal, agent, officer, or director for himself, or itself, or for another person, firm or corporation, wilfully violating the provisions of Section 2 of Part One, or Sections 2–5, inclusive, of Part Two of this act, shall, upon conviction thereof, be fined not less than $200.00, nor more than $1,000.00, for each offense, or, in default of the payment of such fine, by imprisonment in the county jail for not less than three months nor more than one year.

"Any person who either as director, officer or agent of any firm or corporation or as agent of any person violating the provisions of Section 2 of Part One, or Sections 2–5, inclusive, of Part Two, assists or aids, directly or indirectly, in such violation shall be responsible therefor equally with the person, firm or corporation for whom or which he acts.

"In the prosecution of any person as officer, director, or agent, it shall be sufficient to allege and prove the unlawful intent of the person, firm or corporation for whom or which he acts."

The constitutionality of the challenged portions of the four paragraphs above quoted depends upon the same or similar considerations.

The sixth paragraph of section 3 of part, 2 establishes a rule of evidence to be used upon the trial of those accused of a violation of the act. Such a violation as defined in the first paragraph of section 2 of part 2 of the act contains two essential elements: (1) A sale at less than cost; (2) an intent to injure competitors and destroy competition. The sixth paragraph of section 3 of part 2 makes a sale at less than 10 per cent. above the manufacturer's list price less published discounts (which, as already pointed out, may or may not represent the actual cost of the goods sold) not only prima facie evidence that the sale was a sale below cost, but also that the vendor, in making the sale, intended to injure competitors and destroy competition. We have no difficulty in finding a reasonable and fair relationship between sales of goods at less than 10 per cent. above actual cost and the first ele-

ment of the offense defined by the statute (a sale at less than cost), since we think it may fairly be assumed that a merchant cannot ordinarily sell at a profit where he adds less than 10 per cent. to the actual cost of his goods. If all profitless sales of goods were always or were even usually made by merchants for the purpose of injuring their competitors so that it could truly be said that such sales had, in and of themselves, a sinister significance, we would not hesitate to say that the Legislature was within its rights in creating a presumption of sale below cost with wrongful intent. So far as we are aware, however—and there is in the record no evidence to justify a contrary conclusion—such sales have not been regarded as indicating an intent to do evil. There are many reasons, aside from a desire to injure competitors, which might induce a merchant to make profitless sales of goods. The statute itself recognizes the right to meet local competition. A sudden necessity of paying claims of importunate creditors might furnish a reason for sales at less than cost plus overhead. Other similar illustrations are not wanting.

We think the decisions of the Supreme Court of the United States in McFarland v. American Sugar Co., 241 U.S. 79, 36 S.Ct. 498, 60 L.Ed. 899, and Morrison v. California, 291 U.S. 82, 54 S.Ct. 281, 78 L.Ed. 664, indicate that the presumption of guilt created by the sixth paragraph of section 3 of part 2 cannot be sustained.

In McFarland v. American Sugar Co., supra, the court had under consideration a statute of the state of Louisiana intended to prevent a monopoly in the sugar business. The statute, Act La. No. 10 of 1915, Ex.Sess., § 7, provided among other things, that "any person engaged in the business of refining sugar within this State who shall systematically pay in Louisiana a less price for sugar than he pays in any other State shall be prima facie presumed to be a party to a monopoly or combination or conspiracy in restraint of trade and commerce, and upon conviction thereof shall be subject to a fine of five hundred dollars a day for the period during which he is adjudged to have done so." Mr. Justice Holmes, in delivering the opinion of the court, said (at pages 86, 87 of 241 U.S., 36 S.Ct. 498, 501, 60 L.Ed. 899): "As to the presumptions, of course the legislature may go. a good way. in raising one or in changing the burden of proof, but there are limits. It is 'es-

sential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate.' Mobile, Jackson & Kansas City R. R. v. Turnipseed, 219 U.S. 35, 43, 31 S.Ct. 136, 55 L.Ed. 78, 32 L.R.A.,N.S., 226, Ann.Cas.1912A, 463. The presumption created here has no relation in experience to general facts. It has no foundation except with tacit reference to the plaintiff. But it is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime. If the statute had said what it was argued that it means, that the plaintiff's business was affected with a public interest by reason of the plaintiff's monopolizing it, and that therefore the plaintiff should be prima facie presumed guilty upon proof that it was carrying on business as it does, we suppose that no one would contend that the plaintiff was given the equal protection of the laws. We agree with the court below that the act must fall as a whole, as it falls in the sections without which there is no reason to suppose that it would have been passed."

In Morrison v. California, supra, the court considered a statute of the state of California which prohibited an alien, who was neither a citizen nor eligible for citizenship, from occupying land for agricultural purposes, and which made it a crime for such an alien to occupy such land. The statute provided that where the state proved the occupation or use of such land by a defendant and the indictment alleged his alienage and ineligibility for citizenship, the burden of proving his citizenship or eligibility for citizenship should rest upon the defense. Mr. Justice Cardozo delivered the opinion of the court. He said (pages 88, 89 of 291 U.S., 54 S. Ct. 281, 284, 78 L.Ed. 664): "The decisions are manifold that within limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant. The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression."

And on pages 90, 91 of 291 U.S., 54 S. Ct. 281, 285, 78 L.Ed. 664: "Possession of agricultural land by one not shown to be ineligible for citizenship is an act that carries with it not even a hint of criminality. To prove such possession without more is to take hardly a step forward in support of an indictment. No such probability of wrongdoing grows out of the naked fact of use or occupation as to awaken a belief that the user or occupier is guilty if he fails to come forward with excuse or explanation. Yee Hem v. United States, 268 U.S. 178, 183, 184, 45 S.Ct. 470, 471, 69 L.Ed. 904; Luria v. United States, 231 U.S. 9, 25, 34 S.Ct. 10, 58 L. Ed. 101; Casey v. United States, 276 U. S. 413, 418, 48 S.Ct. 373, 374, 72 L.Ed. 632; Mobile, J. K. & C. R. Co. v. Turnipseed, 219 U.S. 35, 42, 43, 31 S.Ct. 136, 55 L.Ed. 78, 32 L.R.A.,N.S., 226, Ann.Cas.1912A, 463; Bailey v. Alabama, 219 U.S. 219, 233, 238, 31 S.Ct. 145, 55 L.Ed. 191; Manley v. Georgia, 279 U.S. 1, 49 S.Ct. 215, 73 L.Ed. 575; People v. Cannon, 139 N.Y. 32, 34 N.E. 759, 36 Am.St.Rep. 668. 'The legislature may go a good way in raising [a presumption] or in changing the burden of proof, but there are limits.' McFarland v. American Sugar Co., 241 U.S. 79, 86, 36 S.Ct. 498, 60 L.Ed. 899. What is proved must be so related to what is inferred in the case of a true presumption as to be at least a warning signal according to the teachings of experience. 'It is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime.' McFarland v. American Sugar Co., supra; Bailey v. Alabama, supra; Manley v. Georgia, supra. There are, indeed, 'presumptions that are not evidence in a proper sense but simply regulations of the burden of proof.' Casey v. United States, supra. Even so, the occasions that justify regulations of the one order have a kinship, if nothing more, to those that justify the others. For a transfer of the burden, experience must teach that the evidence held to be inculpatory has at least a sinister significance (Yee Hem v. United States, supra; Casey v. United States, supra), or, if this at times be lacking, there must be in any event a manifest disparity in convenience of proof and opportunity for knowledge, as, for instance, where a general prohibition is applicable to every one who is unable to bring himself within the range of an exception. Greenleaf, Evidence, Vol. 1, § 79. The list is not exhaustive. Other instances

82

may have arisen or may develop in the future where the balance of convenience can be redressed without oppression to the defendant through the same procedural expedient. The decisive considerations are too variable, too much distinctions of degree, too dependent in last analysis upon a common sense estimate of fairness or of facilities of proof, to be crowded into a formula. One can do no more than adumbrate them; sharper definition must await the specific case as it arises."[2]

It is apparent from this decision of the Supreme Court that in determining the validity of a presumption created by a legislative body, two questions are to be considered: (1) Whether the fact presumed may be fairly inferred from the fact proven; (2) whether the presumption created will be of aid to the state without subjecting the accused to unreasonable hardship or oppression. With respect to the presumption created by the sixth paragraph of section 3 of part 2, we have already pointed out that, in our opinion, the fact of guilty intent is not reasonably to be inferred from the fact of sale at less than 10 per cent. above the cost of the goods. No doubt, the presumption of guilt would be helpful to the state in the prosecution of alleged violators of the statute, but it would be as hurtful to the accused as it would be helpful to the accuser. Intent is something which is easily asserted and hard to disprove. To cast upon a merchant who has sold goods at less than 10 per cent. above their cost, the burden of establishing that the sale was not made with an intent to injure competitors or destroy competition, subjects him to unreasonable hardship. We think the disadvantage to him of the presumption of guilt should be regarded as outweighing the advantage of the presumption to the state.

It is our opinion that the sixth paragraph of section 3 of part 2 is unconstitutional.

The second and third paragraphs of section 1 of part 3, when read together, are so clearly violative of the Fourteenth Amendment to the Constitution of the United States that little need be said about them. As Mr. Justice Holmes said in McFarland v. American Sugar Co., supra, at page 86 of 241 U.S., 36 S.Ct. 498, 501, 60 L.Ed. 899, "it is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime." To visit the sins of the guilty upon the innocent, to impute a wrongful intent to those who have none, to make guilt dependent upon a legislative fiat, ought not to be tolerated under our system of criminal jurisprudence. The provision of this statute, chapter 116, pt. 3, § 1, par. 3, that "in the prosecution of any person as officer, director, or agent, it shall be sufficient to allege and prove the *unlawful intent of the person, firm or corporation for whom or which he acts*," is as clearly violative of the due process and equal protection clauses of the Fourteenth Amendment as it is obnoxious to the sense of justice of every fair-minded person.

"All punitive legislation contemplates some relation between guilt and punishment. To inflict the latter where the former does not exist would shock the sense of justice of every one." Felton v. United States, 96 U.S. 699, 703, 24 L.Ed. 875.

Without the third paragraph, the second paragraph, of section 1 of part 3, if construed to apply to those who knowingly aided and abetted a violation of the statute, would be unobjectionable.

The only other section of this statute which we think it is necessary to consider is section 5 of part 2, which provides: "Where a particular trade or industry, of which the person, partnership, firm or corporation complained against is a member, has an established cost survey for the locality and vicinity in which the offense is committed, the said cost survey shall be deemed competent evidence to be used in proving the costs of the person, firm or corporation complained against within the provisions of this act; and it is further provided that where such cost survey has established a fair and reasonable average cost of doing business for that particular trade or industry, such average cost shall be

[2] See, also, Western & Atlantic R. Co. v. Henderson, 279 U.S. 639, 49 S.Ct. 445, 73 L.Ed. 884; O'Neill v. United States, 8 Cir., 19 F.2d 322. Compare Fong Yue Ting v. United States, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905; Adams v. New York, 192 U.S. 585, 24 S.Ct. 372, 48 L. Ed. 575; Hawes v. State of Georgia, 258 U.S. 1, 42 S.Ct. 204, 66 L.Ed. 431; Bandini Petroleum Co. v. Superior Court, 284 U.S. 8, 52 S.Ct. 103, 76 L. Ed. 136, 78 A.L.R. 826; Lykes Bros. S. S. Co. v. Esteves, 5 Cir., 89 F.2d 528; Snyder v. Commissioner of Internal Revenue, 3 Cir., 73 F.2d 5; United States v. Luria, D.C., 184 F. 643.

deemed prima facie evidence of cost of all individuals, firms or corporations of such trade or industry in such locality and vicinity; and sales at prices less than the actual replacement cost of the goods plus such average cost as above described, shall be deemed to be sales below cost, within the provisions of this act."

While it seems probable that the Legislature in enacting this section had in mind some definite and understandable thing, we think that they failed to express it in plain language. What is a "cost survey," and by whom or by what is it made? Does the section relate to surveys made by trade groups and associations of which an accused merchant is a member, or does it relate to anything which is denominated a "cost survey" no matter who makes it? Is a "cost survey" evidence regardless of whether it is fair or unfair? By the terms of this section a cost survey is prima facie evidence when it is shown to have established a fair and reasonable average cost—but is the question of the fairness and reasonableness of the cost survey a question of law for the court to determine in a collateral inquiry, or is it a question of fact for the jury? How extensive is the locality or vicinity affected by any cost survey? Why should sales at less than "replacement cost" plus "average cost" (as average cost is shown by a cost survey) be treated as sales below cost upon a trial when a cost survey is in evidence, while, if it is not in evidence, the test of a sale below cost would be the published list price less published discounts, or invoice cost or replacement cost plus the accused's actual selling cost. Apparently, under this section, if a cost survey of the fair and reasonable type is introduced upon the trial of a merchant for a violation of the act, the merchant is precluded from showing that the cost of his goods based on list price less published discounts, or on invoice cost, was less than the current replacement cost, whereas, if no cost survey was available, or, if available, was not introduced in evidence, he would at least be permitted to show that on the basis of list price less published discounts, or on the basis of invoice cost, he had paid less for the goods than their current replacement cost, and had actually sold his goods at a profit. This section of the statute we regard as so vague, indefinite, arbitrary, and discriminatory that it cannot be sustained.

Section 4 of part 3 of the statute provides: "The provisions of this act are hereby declared to be severable. If one provision hereof shall be found by the decision of a court of competent jurisdiction to be invalid such decision shall not affect the validity of the other provisions of this act."

Since part 2 of the act, without those provisions of part 2 and part 3 which we have held to be unconstitutional, would be unenforceable, it is obvious that all of part 2 must fall (see Carter v. Carter Coal Co., 298 U.S. 238, 312, 316, 56 S.Ct. 855, 873, 875, 80 L.Ed. 1160), since it is not conceivable that the Legislature would have enacted part 2 without providing for its enforcement.

Part 1 of the act, which is, in substance, a re-enactment of chapter 413, Laws Minn.1921, is, in our opinion, constitutional. Central Lumber Co. v. State of South Dakota, 226 U.S. 157, 33 S.Ct. 66, 57 L.Ed. 164. Part 2 and those portions of part 3 which we have held to be violative of the Constitution of the United States can be eliminated without rendering part 1 unenforceable.

Our conclusion is that the plaintiff is entitled to a permanent injunction restraining the defendants from enforcing part 2 of the act, and to a declaratory judgment that all of part 2 and so much of part 3 as we have herein found to be unconstitutional are invalid.

Proposed findings of fact, conclusions of law, and a decree, in accordance with the views herein expressed, may be presented to this court upon reasonable notice to the defendants.